[Nos. 27006, 27007. *En Banc.* April 21, 1939.]

LOUIS HENRY MILLER et al., *Respondents*, v. LOUISE MOHR et al., *Appellants.*

LOUIS HENRY MILLER, JR., *an Infant, by Louis Henry Miller, Sr., his Guardian ad Litem, Respondent*, v. SISTERS OF ST. FRANCES et al., *Appellants.*[1]

[1]Reported in 89 P. (2d) 807.

620

*Guy E. Kelly* and *Robert E. Evans,* for appellants.

*Ralph Woods* and *Sam A. Wright,* for respondents.

BEALS, J.—This is an appeal from verdicts and judgments rendered against the Sisters of St. Frances and Louise Mohr, in favor of an infant, Louis Henry Miller, Jr., and in favor of the parents of that child.

This case has been argued once to a Department of

this court and twice to the court sitting *En Banc*. Just prior to the last hearing, respondents filed a motion to strike the statement of facts. This motion is without merit, and the same is denied.

In the second amended complaint in cause No. 27006, Louis Henry Miller and his wife, Bertha Miller, brought an action against defendants, alleging that the Sisters of St. Frances is a corporation, organized under the laws of this state; that this corporation conducts, for profit, a hospital in the city of Tacoma, known as St. Joseph's hospital; that this hospital is conducted as a business enterprise, and a fee is charged to those who enter the hospital for treatment; and that, in return for the payment of such fee, the corporation represents and holds out to the public that it will furnish the necessary hospital treatment in a skillful and proper manner, through agents who have been selected in a careful and prudent manner by the officers of the corporation.

It was further alleged that, on September 11, 1932, Bertha Miller, at the request of plaintiffs, was admitted to the above mentioned hospital for confinement, upon the payment of the initial admission fee of $32.50; that, September 12, 1932, there was born to respondent a strong, healthy, male child, thereafter named Louis Henry Miller, Jr.; and that, at all times mentioned in this complaint, the child was in the sole care of defendant corporation.

It was averred that defendant Louise Mohr was a student nurse in the employ of the corporation, and was a single person at the time the injuries hereinafter referred to were sustained.

It was pleaded that, when the child was five days old, it contracted a skin disease known as impetigo; that, the child's mother being unable to care for him, it became and was the duty of defendant corporation

to care for him and to use reasonable care in the selection and retention of a competent nurse; that it failed and neglected to provide a competent nurse to care for the child at the time the injuries in question were sustained, but furnished an incompetent and unskilled student nurse, defendant Louise Mohr; that the nurse had little or no training in the care of infants, and at the time of the injuries was so worn out, tired, sleepy, and highly nervous that she was not in a fit condition to care for plaintiff's child; and that the corporation knew, or by the exercise of reasonable care and diligence should have known, that the nurse was incompetent and not in proper condition to care for the child.

It was also averred that, September 21, 1932, while the child was under the sole care of defendants, its head was negligently and carelessly permitted to come in contact with some hot object unknown to plaintiffs, causing the child's head to be seared black and its scalp and skull to be burned to the brain, resulting in a necrosis of the skull; that, at one place in the region of the anterior fontenal, a hole two inches in diameter was burned, at another place to the left of the posterior fontenal a hole was burned three-fourths of an inch in diameter, and at a third place on the left frontal bone of the child's head there was a burn one-half to three-fourths of an inch in diameter; that these injuries are permanent, and have left the child in such a condition that he requires the constant attention of plaintiffs or of a nurse; that the child will never be able to render that service to plaintiffs which the ordinary child renders towards its parents; and that plaintiffs have incurred doctors' bills in treating the child's injuries. Plaintiffs prayed for judgment for damages against defendants.

Defendants demurred separately to this second amended complaint, and these demurrers were over-

ruled. Defendants then answered, denying generally the allegations of the complaint, and set up an affirmative defense, alleging that the Sisters of St. Frances is a charitable corporation, organized under the laws of this state; that the mayor of Tacoma and the chairman of the board of county commissioners of Pierce county are *ex officio* members of the board of trustees of defendant corporation; that the corporation owns or is engaged in the conduct of a hospital in Tacoma, known as St. Joseph's hospital, and has owned and been engaged in the conduct of that hospital for over forty years.

Defendants further alleged that the Sisters of St. Frances is a charitable corporation; that it has no capital stock and is not operating for profit; that no dividends or profits have ever been paid or can be paid to anyone from the operation of the hospital; that its entire earnings are used solely for charitable purposes; that it has at all times rendered necessary services and care without being paid therefor to those unable to pay for the same, setting forth the number of charitable patients cared for, and the reasonable value of the services rendered to such patients, for the years 1931 to 1935, inclusive.

It was further averred that, in connection with the ownership and operation of St. Joseph's hospital, the Sisters of St. Frances corporation conducts a training school for nurses, where nurses receive professional education and training; that, among the young women who were engaged in taking such nurses' course of training on September 12, 1932, was defendant Louise Mohr; that she completed her course, graduated from the training school, and was duly licensed to practice as a professional nurse by the state of Washington.

Defendant Sisters of St. Frances also alleged that the corporation supplies as nurses for patients in the hos-

pital student nurses in the hospital training school, without additional expense to the patient; that all patients are given the right to procure graduate nurses of their own selection, at their own expense; and that plaintiffs were advised by defendant corporation of these arrangments, plaintiffs electing to accept the services of the student nurses and failing to procure a graduate nurse.

It was alleged that defendant corporation maintains in St. Joseph's hospital what is known as a nursery, wherein all the babies were kept; that Louis Henry Miller, Jr., contracted impetigo, which required that he be removed from the nursery and isolated, to protect the other babies from contracting the disease.

It was also alleged that Louise Mohr, at the time of the accident, had been in professional training as a nurse for nearly two years; that she had received special training in the care of infants; and that she had been given actual charge of the nursery where all the babies were kept, for approximately two months immediately preceding the injury to Louis Henry Miller, Jr.

It was further pleaded that Louise Mohr placed the infant near the center of an adult size bed, in the room to which he had been isolated; that Louise Mohr was, in the performance of her duties, obliged to leave the room for a short period of time, and that when she returned, the infant had moved himself to such a position that his head was against a radiator which stood adjacent to the bed on which the child was lying, and he thereby received certain burns.

Finally, it was alleged that Louise Mohr was a careful, efficient, and capable nurse, experienced in the care of babies, and was known to be such by the officers of the corporation at the time she was selected to care for the Miller child; that she used due care in

placing the infant upon the bed; that she could not have reasonably anticipated that any injury would result therefrom; that the injuries received by the child were purely accidental and were not the result of any negligence or carelessness on the part of Louise Mohr or defendant corporation. Defendants prayed that plaintiffs take nothing, and that the second amended complaint be dismissed.

Plaintiffs replied, denying all of the material allegations of defendants' answer, and specifically denied that the Sisters of St. Frances is a charitable corporation, denied that the hospital is not operated for profit, and denied that the earnings were used chiefly for charitable purposes.

In cause No. 27007, an action was instituted by Louis Henry Miller, Jr., through Louis Henry Miller, Sr., guardian *ad litem,* against defendants, to recover damages for the minor's injuries. In this complaint, it was alleged that plaintiff, Louis Henry Miller, Jr., is under the age of twenty-one years, and that, August 19, 1935, Louis Henry Miller, Sr., was appointed guardian *ad litem,* for the purpose of bringing this action. Save as above indicated and the amount of damages prayed for, the remaining allegations of this complaint are in substance the same as those contained in the second amended complaint in cause No. 27006.

Defendants demurred separately to the complaint, and the court overruled the demurrers. Defendants answered this complaint, denying the material allegations thereof, and setting up an affirmative defense which contains essentially the same allegations as are presented in the affirmative defense in the answer interposed in cause No. 27006. Plaintiffs replied, denying the allegations of defendants' affirmative defense.

The two cases were consolidated for trial, and were

also consolidated upon appeal, by order of this court.

At the close of plaintiffs' cases, defendants separately moved the court for a judgment of nonsuit and dismissal upon the merits and with prejudice because of a total failure of proof of any actionable negligence against defendants, which motions were denied. At the conclusion of all the evidence, defendants moved the court for directed verdicts, or to take the case from the jury and enter a judgment for dismissal on the merits and with prejudice, because of a complete failure of proof of any actionable negligence. These motions were also denied.

The jury returned verdicts in favor of plaintiffs in both cases. Motions for judgment notwithstanding the verdict, or in the alternative for a new trial, were made in both cases and denied, and judgments were entered upon the verdicts, from which defendants have appealed.

Error is assigned upon the admission, over appellants' objection, of evidence concerning the amount of property owned by appellant corporation (which will be referred to as though it were the sole appellant), upon the admission of evidence showing the monthly receipts and disbursements by appellant, and upon the admission of evidence concerning the disease of impetigo, all of which evidence appellant contends should not have been admitted. Error is also assigned upon the admission of evidence concerning the appearance of Mrs. Mohr at places distant from the hospital, at times when she was not on duty, and upon the refusal of the trial court to strike such evidence. Appellant also complains of the refusal of the trial court to permit certain witnesses to answer hypothetical questions propounded by appellant. Error is assigned upon the giving of two instructions, and upon the refusal to give one requested instruction. Ap-

pellant also complains of the refusal of the trial court to direct a mistrial, and of the overruling of appellant's motions, first for a nonsuit, then for a directed verdict, next for judgment notwithstanding the verdict, and finally for a new trial. Error is also assigned upon the entry of judgment against both appellants.

These are the essential facts, as disclosed by the record: Appellant corporation, Sisters of St. Frances, was incorporated on March 17, 1891, under the auspices of the Catholic Church. It owns eight hospitals, one of which is St. Joseph's hospital at Tacoma. There are thirty-one Sisters at the hospital. They receive no salaries and no compensation for their services in and about the hospital, save board and room and their wearing apparel.

The money which is received by the hospital from patients who pay for hospitalization is used to defray the expenses of operation and maintenance of the hospital and its facilities. It has no capital stock, and no dividends or profits have been paid to anyone from the operation of the hospital. The hospital has no income whatever, save such as is obtained from patients who come to the hospital, or from donations made to it.

While certain supplemental and amendatory articles of incorporation have been filed relating to this corporation, they are not material here. In order to appreciate, however, the nature and scope of the activities of this corporation, it is desirable to note certain provisions of its articles and by-laws. The original articles of incorporation provide in part:

"Article 3. Each member shall have a religious vocation specially tending to the art of teaching and instructing and educating the youth and to the care of the sick and helpless, said vocation being determined during the term in the Novitiate and after taking re-

ligious vows and with the approbation of the Bishop of Nisqually.

"Article 4. The objects and purposes of this corporation are to provide hospitals where the sick and helpless may be received and nursed and schools for girls and boys each to be a separate department where those committed to its care shall receive physical, mental and moral training."

The by-laws of this corporation provide:

"ARTICLE FIVE. . . .

"*Section 2.* If it is financially possible the corporation shall furnish free medical attention to those who are financially unable to pay for the same.

"*Section 3.* The corporation shall furnish at all times free board, lodging and nursing to all its inmates who are financially unable to pay for same.

"*Section 4.* The corporation shall furnish at all times free medicines and medical supplies to those who are unable to pay for same.

"*Section 5.* Those who are unable to pay full compensation for their board, lodging, medicines and medical supplies, but who are nevertheless able to pay some fees to help the corporation to defray the expense thereof shall be placed in the wards, and charged at the rate of not more than $2.00 per day therefor."

"ARTICLE SEVEN. FINANCES.

"*Section 1.* All moneys received by the corporation from any and all sources shall be devoted to the provision, maintenance, operations and upbuilding of hospitals where the sick and helpless may be received and nursed and to the training of pupils morally and mentally primarily for the profession of nursing the sick."

"ARTICLE NINE. MEMBERS. . . .

"*Section 2.* None of the members of this corporation shall receive any compensation from the corporation or gratuity from any person whatsoever, for their services in and about the hospital or as teachers or otherwise; any moneys or other property paid or given to any member by any person shall be turned into the treasury of the corporation."

Respondent Bertha Miller was admitted to the hospital for confinement on Sunday evening, September 11, 1932, and paid in advance to the hospital the regular charge for hospitalization for one week. She did not seek charity. She gave birth to a male child, Louis Henry Miller, Jr., on Monday morning, September 12th. At birth, the baby appeared to be a normal, healthy child. A few days later, several of the babies on the fourth floor, the maternity floor of the hospital, including the Miller infant, contracted impetigo, and the afflicted babies were at once isolated. The Miller baby was placed in room 424, and was there at the time of the subsequent accident. The nurse who was assigned to take care of the Miller baby was Louise Blair. She was married in December, 1933, and thereafter her name became Louise Mohr. She is herein referred to as Mrs. Mohr.

On the evening of the accident, September 21, 1932, Mrs. Mohr went on duty at seven o'clock, and, the other babies committed to her care having been discharged with their mothers, she was assigned to take care solely of the Miller baby. She testified that this nine-day-old baby had been placed upon its back, not in a regular infant's bed with guards around it, but in a low adult bed, which was placed parallel to the radiator which was alongside the wall. The top of the radiator was between six and nine inches higher than the bed, and there was a space approximately one inch in width between the bed and the radiator. When Mrs. Mohr left the room, the head of the baby was facing toward the radiator and about one foot from it.

It appears that, at the time of the accident, the nurse was, by the supervisor on the fourth floor, called out of the room to wait upon a patient, at which time she also procured some supplies for the child. She was out of room 424 for about twenty-five minutes between

eight and nine p. m. When she returned, she found the baby lying on its back, with its head turned slightly to the left against the radiator. She picked the child up immediately, and, observing the burns on his head, put him in the center of the bed and went out to notify the superintendent of nurses. Mrs. Mohr obtained some unguentine, and applied it to the baby's head as a first aid measure, and a physician was summoned.

The medical testimony shows that the baby was a healthy appearing child at the time it was burned, and that the injuries sustained consisted of burns to the scalp covering the area from the back of the head over the anterior fontanel and down over the temporal frontal region. There were three main burned areas. Those areas over the anterior fontanel region were two and one-half inches in diameter; the one over the temporal region a little smaller. To remove some of the little pieces of bone from the wound, an operation was necessary. The burns have left permanent scars.

After receiving the burns, the child was treated at the hospital for a little over three months, having been discharged on December 15, 1932.

In regard to the cause of the burns, the Mother Superior at the hospital told Mrs. Miller that the baby was lying upon the bed, and had crawled over to and against the radiator. The hospital attendants testified that this child was never treated with therapeutic lamps. The maternity night supervisor also testified that the baby had been burned on the radiator, and that nothing else could have burned it. Several of the hospital attendants testified that a nine-day-old baby could move itself.

There is medical testimony that a part of the top of the skull is missing, there being no bony covering in that area; and that the intercranial pressure bulges the brain and membranes up, or if the pressure is lessened,

it sucks them in. It was also testified that the child cannot take his place among other children, play the same games, and take the same physical exercise, because, if the scar tissue were injured by a very slight blow or a little scalp wound, the brain substance in that area would bulge up through the opening in the head. Other medical testimony, however, is to the effect that the child could engage in the usual activities of other children.

When Mrs. Mohr made application for admission to the hospital, she was a few months over eighteen years of age. At that time, she told the superintendent of nurses, who had charge of employing nurses, that she had already been in another nurses' training school at Everett General Hospital. She told the superintendent that she had graduated from a high school in Montana, in 1930. Some time later, the superintendent obtained her high school grades. Her high school record and her academic record at the hospital show that she was a girl of superior qualifications.

The hospital superintendent wrote to the Everett General Hospital to inquire about her standing there, but received no answer. No time credit was allowed for any training received elsewhere, and no particular further inquiry was made relative to her character, standing, or experience. The training school did not give or require any mental tests of its applicants prior to admission to the training school. All such applicants are supposed to bring letters of recommendation from their pastor and a physician, but there is no definite showing in the record that these were furnished by Mrs. Mohr to appellant hospital.

Mrs. Mohr was accepted as a student nurse at the hospital January 8, 1931, and graduated as a nurse June 1, 1933. She passed through the probationary period into the hospital, was considered quite compe-

tent and adaptable to nursing, and had never been reprimanded for anything very serious in the training school. She worked in the various departments of the hospital, attended classes in the nurses' training school for nearly nine months, and during that time, took care of mothers and babies. May 15, 1932, she was assigned to the nursery where the babies were kept, under a graduate nurse. She had two months' experience there, and then continued working in the nursery until the middle of July, 1932, under a graduate nurse in charge. She had a vacation from July 15th to August 1st, when she was absent from the hospital. When she returned from her vacation, she was put on the fourth floor as nurse in charge of the nursery from August 1st to September 14th, and at that time she was placed on night duty on the maternity floor.

Prior to this accident, Mrs. Mohr had never had an accident in the hospital, and several physicians testified she was an excellent nurse and a very fine girl. The night supervisor testified she had done very good work with babies. At the time of the accident, Mrs. Mohr was a student nurse, and had been at the hospital for a period of over a year and a half.

The testimony of Mrs. Mohr is to the effect that she had no illness at the time of the accident or for some time prior thereto, and was not sickly or tired and sleepy at that time; but there is testimony to the effect that she appeared sickly several weeks before and at the time of the accident. Several witnesses testified that, for a number of days, Mrs. Mohr had appeared very tired and sleepy while on duty at the hospital. Mrs. Miller testified that she saw Mrs. Mohr several times at the hospital, and that she appeared pale and tired looking. One witness testified that she visited the hospital while the Miller baby was there

and before the baby suffered the burns, and stated Mrs. Mohr appeared tired. Another woman, a patient at the hospital before the Miller child was burned, said Mrs. Mohr appeared to be very tired and dead on her feet. A number of witnesses testified that Mrs. Mohr appeared sickly, very tired and sleepy, and "kind of moped around" while visiting at a packing plant just prior to this accident. There was some testimony that she had so appeared for two or three months before the accident. Mrs. Miller testified that the Mother Superior told her at the hospital, after the accident, "We should have let her go long ago." As the Mother Superior died prior to the trial, her version of this conversation is not disclosed by the record. There was contradictory testimony as to Mrs. Mohr's appearing tired and sleepy at the hospital.

Appellant contends that the trial court erred in admitting, over its objection, evidence offered by respondents concerning the amount of property owned by appellant, and the monthly income and disbursements of appellant's Tacoma hospital.

In such a case as this, one of the first questions to be determined is whether the hospital is a charitable institution. This court, in several cases, has held that a charitable hospital, not conducted for profit, is not liable under the rule of *respondeat superior* for the negligence of its employees, and is not responsible in damages for the negligent act of an employee, unless it appears that the hospital itself was negligent in failing to exercise ordinary care in the selection and retention of the employee. *Bise v. St. Luke's Hospital,* 181 Wash. 269, 43 P. (2d) 4, and cases cited therein. It is suggested that these cases might well be re-examined and a different rule laid down, but the doctrine has been consistently followed in this state for a long period, is in accord with the greater

weight of authority, and we are of the opinion that it should not now be abandoned.

In determining whether a particular hospital should be classed as a charitable institution or as one operated for profit, the first question to be considered is, of course, the structure of the corporation owning and operating the institution, assuming that such institutions are generally owned by corporations. The articles of incorporation and by-laws, which are for judicial construction as matter of law, determine the matter, *prima facie*. As disclosed by the record, appellant was, many years ago, incorporated for designated charitable purposes, undoubtedly pursuant to §§ 1638-1642, Hill's Code. The articles of incorporation and by-laws, pertinent portions of which are above quoted, undoubtedly show that appellant was organized as a charitable corporation, no element of personal profit to anyone being within the purview of the articles or by-laws.

Appellant, in its answer, alleged, and respondents denied, that appellant was a charitable institution. The written evidence introduced showed *prima facie* that, under its charter, appellant was a charitable organization, but respondents, under the pleadings, had the right to show, if they could, that, in conducting its business, appellant did not observe the basic principles laid down in its articles of incorporation and by-laws, but in fact appropriated some portion of its income to the private profit or advantage of some individual or other corporate entity. Upon this phase of the matter, a question of fact would be presented, which, if there should be a conflict in the evidence, must be determined by the jury. *Southern Methodist Hospital etc. v. Wilson*, 45 Ariz. 507, 46 P. (2d) 118. Evidence, however, upon this question, offered for the purpose of proving that the hospital was not conducted as a

charitable organization, should, subject to the ordinary rules of evidence, tend to prove that fact. Respondents offered much evidence, which was admitted over appellant's objection, tending to prove that appellant owned a large amount of valuable real estate, improved with hospitals or schools, and that the Tacoma hospital, conducted by appellant, engaged in a very extensive business, collecting and disbursing each month many thousands of dollars. Evidence was received, over appellant's objection, showing the receipts and disbursements of the Tacoma hospital during a period of over four years.

The fact that patrons of a hospital pay for the service rendered does not deprive the institution of its character as a charitable organization, provided always that the income is devoted to the accomplishment of the charitable purposes of the hospital, and that no portion thereof is diverted to private profit or advantage.

At the close of the case, the trial court instructed the jury that, under the evidence and as matter of law, appellant's hospital was a charitable institution. No exception was taken to this instruction, which became the law of the case. This instruction was in accord with the following decisions of this court: *Richardson v. Carbon Hill Coal Co.,* 10 Wash. 648, 39 Pac. 95; *Wharton v. Warner,* 75 Wash. 470, 135 Pac. 235; *Magnuson v. Swedish Hospital,* 99 Wash. 399, 169 Pac. 828; *Tribble v. Missionary Sisters of Sacred Heart,* 137 Wash. 326, 242 Pac. 372. See, also, Zollman, American Law of Charities (1924), 155, § 220.

We find no evidence even suggesting that the officers or agents of appellant violated the organic law or the by-laws of appellant by diverting to the personal or private advantage or profit of any person any of the income received from the operation of the hospital.

■■ Respondents argue that the record shows that the hospital took in more by way of operating receipts than the amount of its total operating costs, and that it reduced or paid a large mortgage upon the hospital property. The fact that the income of a corporation exceeds its operating expenses does not make a charitable corporation any the less an organization of that class, if the excess of income be used for carrying on the charitable purposes for which the corporation was organized. Paying a legitimate corporate indebtedness, is certainly in furtherance of the charitable purpose of the corporation. Neither does the amount of monthly or annual income of such corporation have any bearing upon this question, nor is that matter affected by the amount or value of property which the corporation may own. A small hospital, if intended to pay dividends or to earn financial profit or advantage for its officers or stockholders, should not be classed as a charitable institution, while the largest hospitals, if organized as charitable corporations, and appropriating any excess of income over expense to the expressed objects of the incorporation, are still charitable organizations.

In the case of *Baylor University v. Boyd*, 18 S. W. (2d) (Tex. Civ. App.) 700, the court of civil appeals of Texas, considering questions somewhat similiar to those here presented, said:

"In this case the evidence indisputably shows that the hospital in question is a charitable institution, that it is not operated for profit, and that if, at the end of any fiscal year, there should be a surplus, over the expense of maintaining and operating the hospital, derived from payments by its patients and public contributions, such surplus is placed in the general fund of the hospital and used for its general charitable purposes. It necessarily follows that the court should have held, as a matter of law, that Baylor Hospital

is a charitable institution, and should not have submitted such question to the jury as a disputed issue of fact. The finding of the jury, in response to special issue No. 12, that Baylor Hospital was not a purely charitable institution, is not sustained by any substantial evidence, and was not a disputed issue of fact to be submitted to the jury."

It is, of course, the general rule that, in actions for damages against private individuals or corporations, the amount of property owned by the defendant cannot be shown.

In the case of *Baer v. Chambers*, 67 Wash. 357, 121 Pac. 843, Ann. Cas. 1913D, 559, this court reversed a judgment based upon the verdict of a jury in plaintiff's favor, because evidence as to the amount of property possessed by the defendant had been admitted, over defendant's objection.

In the case of *Phillips v. Thomas*, 70 Wash. 533, 127 Pac. 97, Ann. Cas. 1914B, 800, 42 L. R. A. (N. S.) 582, a judgment in plaintiff's favor based upon the verdict of a jury, in an action for alienation of affections, was reversed, because evidence of the defendant's wealth had been admitted. In the case cited, it was contended that any error in the admission of the evidence had been cured by an instruction of the trial court directing the jury to "disregard the wealth and resources of the respective parties" in arriving at a verdict. This court held that, in the absence of evidence tending to show that the defendant in some manner held out her wealth as an inducement to the plaintiff's husband to desert the plaintiff, the evidence was inadmissible and highly prejudicial. It was the opinion of this court that the verdict which the jury rendered in the plaintiff's favor was excessive, showing that the jury had been influenced either by improper evidence or improper motives. It was held that, in view of all the

circumstances, notwithstanding the instruction of the trial court to disregard the evidence, a new trial should be granted.

In the case at bar, the amount awarded to respondents cannot be held excessive, but nevertheless the case cited bears upon the question now under consideration.

The rule is well stated in 17 C. J., title "Damages," 845, and 10 R. C. L., title "Evidence," 957, § 130.

The matter of the admission of the evidence concerning the amount of property owned by appellant, the income of the Tacoma hospital, and even such details as the amount of cash the hospital had on hand at the time of trial, and the name of the bank in which the same was on deposit, was the theme of much argument between opposing counsel. The matter did not appear merely casually or incidentally, but was deliberately made a part of respondents' case in chief, and was the subject of extensive cross-examination of certain of appellant's witnesses. It was not preliminary to, nor in support of, any evidence to the effect that any profit or personal gain from the operation of the hospital accrued to any trustee, stockholder, or individual, because no such evidence was introduced. Under these circumstances, the evidence was entirely irrelevant to the issues which it was the duty of the jury to decide. It was evidence peculiarly likely to distract the attention of the jury from the real issues in the case, and the jury was never told to disregard it.

The evidence was admitted over the strenuous objection of appellant's counsel, and apparently the trial court never informed counsel, prior to the time the jury was instructed, that the issue of whether appellant was a charitable institution would not be submitted to the jury. In its preliminary instructions, the

trial court stated to the jury the issues in the case as made up by the pleadings, including respondents' allegation that appellant conducted its hospital for profit, the fact that, in its answer, appellant denied this allegation and pleaded that it was a charitable organization, and the further fact that respondents' reply specifically denied that appellant was a charitable corporation, that its earnings were used for charitable purposes, and that the hospital was not operated for profit. The trial court gave the usual instructions as to the burden of proof, the preponderance of the evidence, etc., and instructed the jury at some length as to what state of facts would make a corporation operating a hospital a public charitable institution. After several other instructions, the court finally instructed the jury that, under the evidence and as a matter of law, appellant corporation was, at the time of the accident, and thereafter, a public charitable institution.

If the trial court intended to instruct the jury, as it did, that, as matter of law, appellant was a charitable institution, there was no occasion for advising the jury as to the allegations in the pleadings of the respective parties concerning this matter. The instruction which the court gave, that appellant was a charitable institution, followed by the instructions given by the court stating the responsibilities and obligations of such an institution, would have been sufficient. Under the instructions as given, the evidence which had been admitted concerning the value of appellant's property and appellant's income had no bearing upon any issue which the court submitted to the jury.

The court never instructed the jury to disregard the evidence which had been admitted concerning the value of appellant's property and its income. The trial court did instruct the jury that appellant, being a charitable institution, was not liable to respondents

unless appellant, through its officers and agents, had failed to exercise ordinary care in selecting and retaining the nurse who was in charge of the infant at the time of the accident.

The issues to be decided by the jury presented questions difficult to determine, and we are of the opinion that the admission, over appellant's objection, of the great mass of evidence concerning appellant's financial resources, which evidence was never stricken from the record, constituted reversible error, which was not cured by the court's instruction that appellant was in fact a public charitable institution.

Counsel for respondents, in opening the case to the jury, referred to the amount of property owned by appellant corporation, and to other matters which appellant contends were not properly within the issues to be tried. It is unnecessary to notice these matters, as it is unlikely that upon the next trial of the case any basis will be afforded for similar criticism.

Appellant next contends that the court erred in admitting, over appellant's objections, and in refusing to strike, on appellant's motion, testimony as to the appearance and apparent condition of Louise Mohr at a place distant from the hospital, which she visited after her duties at the hospital had been performed.

It appears that Mr. and Mrs. Eugene Russell occupied a dwelling a considerable distance from the hospital and about fifty feet from the plant of a business known as Valley Packing Company. Mrs. Russell's daughter, Mrs. Donna Hagen, went to the hospital for her confinement during the month of September, 1932. She left the hospital with her baby a few days before respondents' child was injured. Mr. and Mrs. Russell, Mrs. Hagen, and Doris Russell, who stated that she was Mrs. Russell's niece, testified that, from the Russell home, during different periods prior

to the accident, they frequently saw Mrs. Mohr at the packing company's plant, and that she appeared tired and sleepy. Carl Anderson, an employee of the packing plant, testified to the same effect. One of the witnesses testified that she looked tired and sickly. Appellant strenuously objected to the introduction of this testimony, and at an appropriate time moved to strike the same, the trial court denying the motion. Several of these witnesses testified concerning Mrs. Mohr's appearance and manner while on duty at the hospital, and the admission of such testimony is not assigned as error.

Mrs. Mohr was sometimes on night duty at the hospital, and at other times was on day duty. The witnesses testified that, while at the packing plant, Mrs. Mohr sometimes was seen sitting on the porch, and sometimes seated in a motor vehicle. Respondents argue that, if while off duty Mrs. Mohr appeared tired and sleepy, it is some evidence that she would present a similar appearance while on duty.

While the witnesses testified that they frequently saw Mrs. Mohr at the packing plant, they did not state definitely how long she remained there, nor did they describe her actions, otherwise than as above stated. It is not even suggested that anyone connected with the hospital had any knowledge of the fact that the nurse was visiting the packing plant.

It is, of course, perfectly reasonable to suppose that, after being on duty at a hospital for the number of hours constituting a day's work, a nurse would frequently be tired and sleepy. That is true of many persons who perform an honest day's work, and it is matter of common knowledge that nursing is arduous labor, involving much physical and mental strain.

It does not appear that Mrs. Mohr was other than

punctual in reporting for duty at the hospital, and apparently, in her courses of study and the work which she performed, she pleased her superiors.

In the case at bar, the basis of appellant's liability, if any, can only be that it was negligent in employing, or maintaining in its employ, a person who was not competent to perform the services which she, as an employee, was required to render to the patrons of the hospital. Naturally, the officers of appellant, whose duty it was to hire and discharge its employees, can be held for the exercise of their judgment concerning the qualifications of such employees only in the light of such information as such officers possessed, or which they, in the exercise of reasonable diligence, should have obtained. The witnesses whose testimony is now under discussion all testified to practically the same state of facts, to-wit, that, during a period of two or three months prior to the date of the injury to respondents' child, they frequently saw Mrs. Mohr at a place distant from the hospital, and that, in the opinion of the witnesses, she looked tired and sleepy. Assuming, for the sake of argument, that the testimony of these witnesses indicated that Mrs. Mohr might not have been in the best possible physical condition to perform her duties or measure up to the responsibilities which rested upon her, the matter has no bearing upon appellant's responsibility, unless in some manner the information had been brought home to appellant prior to the accident. *Simon v. Hamilton Logging Co.*, 76 Wash. 370, 136 Pac. 361.

Generally speaking, it cannot be held that testimony to the effect that one who is performing arduous service during working hours is sometimes tired and sleepy after such a period of duty, is competent evidence that the same individual would be tired and sleepy, and consequently inefficient, during the regu-

lar periods of work. If it were contended here that Mrs. Mohr had fallen asleep while it was her duty to watch the baby, or had left the baby and gone to sleep somewhere else during her hours of duty, a different question would be presented.

The evidence is too remote; it involved a collateral issue, opening an indefinite line of inquiry, leading into a maze of assertion and contradiction; and whether it can be said to have possessed any legal probative force, is extremely doubtful. If witnesses could testify, as did those offered by respondent in the case at bar, that a certain person, outside of hours of duty, at times remote from the day when some event which was the subject of litigation occurred, seemed tired and sleepy, why could witnesses not be called by opposing counsel to testify that, on the same or possibly other occasions, the person in question appeared rested, strong, and lively! The field of inquiry might well be limited only by the patience of the court. In the case at bar, it can readily be understood that the evidence which the court admitted may have been extremely prejudicial. This is particularly true in view of questions propounded to certain witnesses by respondents' counsel, to which questions objections interposed by appellant were sustained.

The trial court erred in admitting this line of testimony, and in refusing to strike the same.

■ Appellant submitted a requested instruction to the trial court, concerning the alleged negligence of appellant in employing an incompetent nurse, one paragraph of which read as follows:

"In reaching your decision on this point, you will not take into consideration the fact that this accident happened, or any events which occurred subsequent to the accident."

The trial court, with a pen, struck out the words "the fact that this accident happened or," and gave the instruction with these words deleted. The portion of the instruction above quoted, as submitted by appellant, was proper, and the words deleted should have been included therein. In view of other instructions given by the trial court, it is possible that the instruction as given would not constitute reversible error, but in view of the fact that the case will be retried, and a similar instruction may be requested, this matter is worthy of note.

The instruction, bearing the deletion as made by the trial court with a pen, was allowed to go to the jury, a practice not to be commended.

Appellant vigorously contends that the trial court erred in refusing to enter judgment in appellant's favor as matter of law. Careful examination of the record convinces us that the trial court did not err in this particular. Questions were presented which should be passed upon by the trier of the facts.

Some other questions are argued, which we do not find it necessary to discuss.

For the errors above referred to, the judgments appealed from are reversed, and the causes remanded for a new trial.

JEFFERS, ROBINSON, SIMPSON, and STEINERT, JJ., concur.

BLAKE, C. J. (dissenting)—The majority opinion is premised upon the theory that several errors appear in the record.

First, the majority conclude that the trial court erred in admitting, over proper objection, evidence showing the property, wealth, receipts, income, and disbursements of appellant hospital. It will be admitted that the introduction of this evidence in a case involving

a private corporation organized and operated for profit might constitute prejudicial error.

It should be noted that, in their pleadings, respondents alleged that appellant corporation was organized and conducting its business enterprise for remuneration and profit. Appellant corporation by its answer denied this, and alleged it was a charity.

While the articles of incorporation and the by-laws of appellant corporation are *prima facie* evidence of its character as a charitable institution, such evidence may be refuted by showing it has not lived up to the principles set forth in the articles and by-laws. It is, therefore, a question of fact to be determined as to whether or not an institution is charitable in character. To determine this, required a showing of the manner in which this hospital conducted its business, the compensation exacted from patients, and the channels to which its earnings and monetary donations were allocated.

By instruction No. 8, the trial court correctly instructed the jury, as a matter of law, that appellant corporation was a charitable institution. *Richardson v. Carbon Hill Coal Co.,* 10 Wash. 648, 39 Pac. 95; *Tribble v. Missionary Sisters of Sacred Heart,* 137 Wash. 326, 242 Pac. 372; *Baylor University v. Boyd,* 18 S. W. (2d) (Tex. Civ. App.) 700. Testimony respecting receipts, income, and disbursements was essential to show whether the funds of the corporation were devoted exclusively to charitable channels. Manifestly, respondents acted in good faith in introducing this evidence, and under the pleadings the introduction thereof was proper. If any error was made by reason of the introduction of the evidence relating to the financial affairs of the corporation, it was cured by virtue of instruction No. 8.

In *Armstrong v. Wallace,* 8 Cal. App. (2d) 429, 47 P. (2d) 740, it was said:

"To determine whether or not a private hospital conducted by a corporation or society is charitable, it is necessary to look not only to the articles of incorporation and by-laws, but also to the method of conducting the hospital."

In *Sessions v. Thomas Dee Memorial Hospital Ass'n,* 89 Utah 222, 51 P. (2d) 229, the court observed:

"When questioned, the status of the institution, whether charitable or otherwise, is an issue to be determined from the pleadings and proof as other issues.

"The fact that an association is organized with or without capital stock is a matter of proof, and as such may weigh for or against its claimed charitable character. So may the matter of whether the institution exacts payment for all patients, or only a part of them, or none of them. So may the manner and amount of profits or accumulations, if any, and the purposes and manner of distribution or use thereof, whether the institution may be privately owned and the nature of that ownership and use, the activity engaged in—all are matters of evidence."

See, also, *Susmann v. Young Men's Christian Ass'n,* 101 Wash. 487, 172 Pac. 554; *Stewart v. California Medical Missionary & Benevolent Ass'n,* 178 Cal. 418, 176 Pac. 46; *Southern Methodist Hospital etc. v. Wilson,* 45 Ariz. 507, 46 P. (2d) 118; *Bruce v. Henry Ford Hospital,* 254 Mich. 394, 236 N. W. 813.

The majority rely upon *Baer v. Chambers,* 67 Wash. 357, 121 Pac. 843, Ann. Cas. 1913D, 559, and *Phillips v. Thomas,* 70 Wash. 533, 127 Pac. 97, Ann. Cas. 1914B, 800, 42 L. R. A. (N. S.) 582, in support of its conclusion that the introduction of testimony, over objection, relating to the pecuniary resources of appellant corporation, constituted error. It should be noted that neither of these cases involved charitable corporations; moreover, it was manifest in *Phillips v. Thomas, supra,*

that the amount fixed by the verdict reflected an unwarranted consideration by the jury of testimony relating to the question of financial worth; and finally, these cases are entirely dissimilar on their facts in respect to the subject matter on which the actions were based.

In cause No. 27006, a verdict was rendered for $2,500, and in cause No. 27007, a verdict was rendered for $17,500, and judgment was entered in these respective amounts. In view of the nature of the injuries sustained, the amounts fixed by the verdicts and judgments are certainly not excessive, as the majority concedes. The admission of the testimony relating to financial matters was, therefore, proper and not prejudicial.

Second, the majority conclude that the trial court erred in permitting the introduction of evidence relative to Mrs. Mohr's tired and sleepy condition away from the hospital.

I agree with the majority that the rule that the liability of charitable corporations to their patients should be limited to such injuries as are caused solely by reason of its failure to use ordinary care in the selection and retention of its servants, should not be departed from.

While negligence is never presumed and must be affirmatively established by competent evidence, the jury was warranted in finding the nurse was negligent because of the undisputed evidence that the body was placed upon an adult bed without guards, and the bed was only one inch removed from the radiator.

The question then remains as to whether appellant corporation was negligent in employing or retaining Mrs. Mohr, and whether her tired and sleepy condition was or should have been discovered by her superiors at the hospital in the exercise of ordinary care by them.

In the two or three months preceding the accident, and at the time of the injury, there was testimony that Mrs. Mohr was very tired and sleepy. The existence of such a physical condition, if believed by the jury, might very well have substantially impaired her competency in the discharge of her duties at the hospital. Although there was also testimony to the contrary, that was a question of fact for the jury.

The weight and credibility of the testimony of the witnesses, whether interested or not, and the inferences to be drawn therefrom, were for the jury. There was sufficient testimony, if believed, to raise a duty upon the part of appellant corporation to discharge appellant nurse because of her tired physical condition, which necessarily impaired her competency and efficiency. Under such circumstances, failure to discharge her or to grant her leave until she had recuperated, constituted negligence. The testimony shows Mrs. Mohr's tired and sleepy condition had existed for a period of such duration that the hospital authorities, in the exercise of ordinary care, should have discharged her before the accident occurred. *Tribble v. Missionary Sisters of Sacred Heart, supra; Griffin v. Smith,* 132 Wash. 624, 232 Pac. 929; *Nearhoff v. Rucker,* 156 Wash. 621, 287 Pac. 658; *Simmons v. Anderson,* 177 Wash. 591, 32 P. (2d) 1005; *Sauers v. Mutual Benefit Health & Acc. Ass'n,* 187 Wash. 262, 60 P. (2d) 103; *Corbaley v. Pierce County,* 192 Wash. 688, 74 P. (2d) 993.

In *Peterson v. Great Northern R. Co.,* 166 Wash. 538, 7 P. (2d) 963, we said:

"The jury had a right to weigh the testimony of this witness along with all the other evidence in the case. It would be going too far for the court to say, as a matter of law, that this testimony overcame the inference which the jury had a right to draw from the other evidence offered. It is a well-known rule that

a case will not be taken from the jury when there is substantial evidence to sustain the verdict, or where there is reasonable inference from the facts established by the evidence which will sustain the verdict."

"The question whether the master knew or ought to have known of the servant's incompetency is primarily one for the jury." 3 Labatt's Master & Servant, (2d ed.), 2895.

In *Norfolk Protestant Hospital v. Plunkett,* 162 Va. 151, 173 S. E. 363, the court said:

"It is not sufficient to say that a nurse is competent simply because she is capable of discharging the manual duties incumbent upon her as a nurse. It is a matter of common knowledge that the welfare of a patient is as much the responsibility of the nurse as it is of the physician. If she is lacking in educational preparation, if she is guilty of indiscretions that impair her physical or mental status, if she is lacking in that moral character which imbues the patient with confidence, then it cannot be said that she is a competent person to be placed in charge of a helpless patient."

The majority assert that one is necessarily tired and fatigued after an honest day's work, assiduously pursued. With that conclusion, I am in accord. However, the majority overlooks the testimony of witnesses, although contradicted, to the effect that, for a number of days prior to this accident, Mrs. Mohr appeared tired and sleepy at the hospital. Conceding Mrs. Mohr to be somewhat tired after a day's work, still the evidence relating to the keeping of late hours and her tired and sleepy condition at the packing plant was admissible for what it was worth to corroborate the testimony in regard to her tired and sleepy condition at the hospital while on duty. That was not a collateral matter. It is sufficient that, under the facts, the jury could have found this matter either was or should have been brought home to those in charge of the hospital in the exercise of ordinary care.

In establishing negligence in the selection and retention of agents and employees by charitable institutions, it is often difficult to prove some facts by direct testimony, and hence resort must often be had to circumstantial evidence. The very tired and fatigued physical appearance of appellant nurse, during the two or three month period preceding the accident, at a packing plant which is located several miles away from the hospital, as noticed by several disinterested people who saw her during these periods away from her duty, is strongly persuasive of what her appearance was likely to be upon her return to assume her duties at the hospital. If this physical condition was noticeable to persons who observed her away from the hospital, it is reasonable to suppose that it should have been noticeable to those in charge of appellant's hospital. Some witnesses testified that the nurse's condition, while on duty, was essentially the same as her condition away from the hospital. This evidence was competent and admissible and its weight was for the jury. The nurse's physical condition, and the opportunity of the hospital authorities to notice it before the accident, like any other fact, may be proved by circumstantial evidence. *Jensen v. Schlenz*, 89 Wash. 268, 154 Pac. 159.

In *Mathis v. Granger Brick & Tile Co.*, 85 Wash. 634, 149 Pac. 3, we stated:

"Many familiar decisions are cited to the effect that verdicts based upon pure conjecture will not be permitted to stand. In applying this principle the respondent loses sight of the clear distinction between pure conjecture and reasonable inference. Negligence, like any other fact, may be proven by circumstantial evidence."

In *Sweeten v. Pacific Power & Light Co.*, 88 Wash. 679, 153 Pac. 1054, we said:

"The respondent was not required to prove the cause of the accident beyond a reasonable doubt, but only

by a preponderance of the evidence. It is true, as we have often held, a verdict may not rest upon pure speculation, but the correlative is also true that a verdict resting upon competent evidence may not be set aside upon pure speculation."

I am convinced that the lower court did not err in admitting testimony in regard to Mrs. Mohr's tired and sleepy condition at the packing plant.

Any possible error occasioned by the change in the instruction given, referred to in the majority opinion, was cured by the remaining instructions given, considered in their entirety.

Being convinced that there are no prejudicial errors in the record, the judgment should be affirmed. I therefore dissent.

MAIN and MILLARD, JJ., concur with BLAKE, C. J.

