[No. 28865. *En Banc.* April 30, 1943.]

VIOLET CLAMPETT, *Respondent,* v. SISTERS OF CHARITY
OF THE HOUSE OF PROVIDENCE, *Appellant.*[1]

*J. Speed Smith* and *Henry Elliott, Jr.,* for appellant.
*Kennett & Benton,* for respondent.

GRADY, J.—This action was brought by respondent,
Violet Clampett, against appellant, the Sisters of Char-

[1]Reported in 136 P. (2d) 729.

ity of the House of Providence in the Territory of Washington, a corporation, to recover damages resulting from a burn received by her while at a hospital operated by appellant. The jury returned a verdict for the respondent. Judgment was entered upon the verdict, from which this appeal is taken.

The theory upon which the action was brought and tried was that the appellant was guilty of administrative negligence in that it furnished, to be used, and there was used, in the treatment of the respondent at appellant's hospital, an electric rubber heating pad which was defective.

The respondent entered the hospital of the appellant November 13, 1941, and the next day an operation was performed upon her. Following the operation, respondent was threatened with pneumonia. On November 17th, her physician ordered that heat be applied to her left shoulder and left chest. At one o'clock in the afternoon, a nurse secured an electric heating pad, wrapped it in a towel and securely pinned it, and applied the pad to the left chest of the respondent. She turned the electric current on what is termed "low" to heat the pad to a temperature of 110°. At eleven o'clock that night, the nurse on duty observed a red streak on the left breast of respondent, which developed into a blister about the size of a nickel. Later more small blisters appeared, the affected area being two and one half to three inches in diameter. This area became infected, and it was treated by her physician, who later removed some scar tissue.

It is the claim of appellant that there was not sufficient evidence to be submitted to the jury that the electric pad was defective and that its challenge thereto should have been sustained.

The type of pad used by appellant is made of rubber and is about nine inches wide and thirteen inches long.

654

Within the pad are two automatic thermostats, one close to each end, and an electric heating unit. The thermostats are bimetal strips with contacts on them. The bimetal strips open with the heat generated by the electric current. The two different metals do not expand the same, and this uneven expanding ratio causes them to bend back and forth, thus opening or breaking the circuit. As the temperature lowers, the contraction causes contact, and the current again flows. At one end of the pad is a rubber tube about thirteen inches long, at the end of which is a switch by which the current is turned on at "low," "medium," or "high," or turned "off." The current comes through a cord attached to the switch, which cord is connected with the ordinary wall or light socket. The literature furnished by the manufacturer states:

"The heating-unit consists of two metallic circuits—one for 'low' heat, and one for 'medium' heat, the two operating in 'parallel' for the 'high' or 'starting' heat. . . .

"In the open, at ordinary room-temperature the pad will attain approximately the following temperature:
" 'low'          110° Fahrenheit
" 'medium'       120° Fahrenheit
" 'high'         135° Fahrenheit
" . . . Both thermostats control temperature on all heats."

The expert witness called by the appellant had examined the pads introduced in evidence as being the kind of pad used on respondent, and testified:

"Q. Did you test it on medium and low? A. Yes. Q. Will you give us the testings on low? . . . A. And on low 124 is the highest and 121 the lowest. Q. What do you mean by that? A. Well, that is on about 14 operations, and the highest test at any one time was 124 and the lowest 121. Q. Now, haven't you got the two confused? A. No. Q. What? A. I gave the medium. 108 to 109. Q. The medium was what? A. 121 to 124.

. . . Q. On the low? A. On the low, 108 to 109. There is no cut-out on low. Q. It is just continuous? A. That is continuous heat."

The pads sometimes get out of repair through use, and, when this happens, they will overheat, or, in some instances, they will not heat. If a pad is in good order and properly applied, it will not burn the patient.

The respondent testified that, just before the pad was first applied to her, the nurse stated to an intern who was present that the pad was not working right and there was something wrong with it. The intern took the pad and looked it over and did something with it, but the respondent could not state what this was. Both the nurse and the intern denied that this occurrence took place, but the jury evidently accepted the version of the respondent.

The evidence in the case shows conclusively that there was no negligence on the part of the agents or employees of the appellant as to the manner in which they performed their duties in connection with their care and treatment of the respondent, and it is not claimed by respondent that the appellant was in any way negligent in the selection of such agents or employees. Throughout the trial, the appellant was given the benefit of the limited liability rule accorded to charitable hospitals set forth in *Miller v. Sisters of St. Francis,* 5 Wn. (2d) 204, 105 P. (2d) 32, and later approved in *Canney v. Sisters of Charity,* 15 Wn. (2d) 325, 130 P. (2d) 899. And the trial judge very carefully guarded against any opportunity for the jury to bring in a verdict against the appellant by reason of any negligence of its employees. The facts disclosed by the evidence and the inferences to be drawn therefrom, coupled with the fact that the respondent did receive a burn from the pad used, were sufficient to

make it a question for the jury to determine whether the pad was defective.

■ The appellant urges that the court erred in refusing to admit its proffered evidence that it is a charitable institution. The case was tried and submitted upon the theory that the appellant is a charitable institution and could be liable in damages to respondent only in the event the electric pad was defective. As a matter of fact, proof by appellant that it is a charitable institution would have reached the same result. The evidence offered was therefore immaterial.

■ The appellant claims there was misconduct of counsel during the trial, in that the attorney for respondent made reference to another case against the appellant, tried shortly before the present case, in which a plaintiff was awarded a verdict because she had been burned by a similar electric pad. During the trial of this case, other references were made to the other case to which no objections were made. During the examination of the jurors in the trial of this case, it developed that one of them had served as a juror in the trial of the other case, but he was accepted by appellant. We do not think any prejudice resulted by the reference to the former case by counsel for respondent.

We have considered the assignments of error in the giving and refusal of instructions to the jury, and we find no error.

Judgment affirmed.

MILLARD, BEALS, BLAKE, and JEFFERS, JJ., concur.

ROBINSON, J. (dissenting)—This case is very similar to that of *Jankelson v. Sisters of Charity, ante* p. 631, 136 P. (2d) 720, decided this day. The same simple, narrow, and direct issue was involved in the lower court. I quote briefly from the instructions to the jury:

" . . . but before the plaintiff can recover she must prove by a fair preponderance of the evidence that she received burns as the proximate result of being treated with a defective or unsafe electrical heating pad, . . ."

In fairness to the appellant and to the majority, it must, however, be conceded that Mrs. Clampett presented a somewhat stronger case than that presented by Mrs. Jankelson. The respondent in this case in no way interfered with the pad, and, what is more important, she was burned at the point where the pad was needed and applied, and not at a place where the pad had no business to be. Nevertheless, I think the verdict was speculative.

It was claimed here, as in the *Jankelson* case, that the pad was defective, in that its thermostats had become so tired out as to permit overheating. There was no direct proof of this. As in the *Jankelson* case, Mr. Overacker, whose experience was limited to fabric pads, testified that thermostats in such pads were unreliable, and in this case, as in that, evidence was introduced, not defensively, but by the respondent's attorney, to the effect that the thermostats in the pad involved, which thermostats Overacker had never seen and with which he had had no experience, were of a patented type, expressly designed to correct the deficiencies of the thermostats used in fabric pads. For the reasons more fully shown in the opinion in the *Jankelson* case, I think Mr. Overacker's evidence had no more relevancy to the issue in this case than it had in that. It in no way tended to prove that the pad was defective.

In this case, as in the *Jankelson* case, the claimed inference that the pad was defective does not flow from a fact which the jury was entitled to find from evidence, but rather is arrived at by a process of elimination. It is said that the burns could have been caused in only

one of two ways, either the pad was improperly applied or maintained or it was defective. When one of the ways is eliminated, the other stands proven.

Mrs. Clampett's private nurse discovered the burn when she came on night duty. She described it as "a red streak which seemed to develop into a blister during the night." It is difficult to imagine how such a burn could be made by a flat surface, though easy to see how it could be made by the unprotected edge of the pad or by a hot pin. This witness, who was not responsible for the application of the pad, said that it was wrapped around the patient's left breast, and she withstood a somewhat prolonged, argumentative examination designed to elicit an answer that it was protected by a towel. She finally said she could not remember whether it was or not. Miss Murray, the hospital nurse who applied the pad, testified:

"Q. Tell the jury just how you applied this pad to Mrs. Clampett. A. I wrapped it in a towel *and pinned it securely* and applied it to her chest and put the control on low." (Italics mine.)

Mrs. Clampett herself testified:

"Q. Will you tell the jury the manner in which it was applied? A. Well, they came in to put the pad on, and they wrapped it in a towel *and pinned it thoroughly*, and placed it down on my breast, but they had trouble with the pad." (Italics mine.)

Since plaintiff could not recover in this action if her burns resulted from the negligence of the nurses, her counsel took great pains to show that they were thoroughly instructed as to the use of the pads. Among other things, he produced and put in evidence the instructions sent with the pads by the manufacturers, and submitted evidence that a copy of them was furnished to the nurses with the pads and became the instructions of the hospital. These instructions are headed

"Important," in large black type, followed by the admonition: "Be sure to read these directions carefully before using." Direction No. 4 reads as follows:

"4. Never use pins or other metallic means to fasten this pad in place, *under any condition of use.*" (Italics mine.)

I cannot give my assent to the following statement in the majority opinion:

"The evidence in the case shows conclusively that there was no negligence on the part of the agents or employees of the appellant as to the manner in which they performed their duties in connection with their care and treatment of the respondent, . . ."

It is further said in the majority opinion:

"The respondent testified that, just before the pad was first applied to her, the nurse stated to an intern who was present that the pad was not working right and there was something wrong with it. The intern took the pad and looked it over and did something with it, but the respondent could not state what this was. Both the nurse and the intern denied that this occurrence took place, but the jury evidently accepted the version of the respondent."

Granting that the jury accepted it, what did it do with it? As I read this evidence, there was nothing tending to prove that the pad was defective in respect to overheating or in any other way that would make it unsafe for use. If there was, then the negligence of the intern or nurse, or of the two combined, in using an unsafe pad, was the real cause of respondent's injury, and one for which the appellant hospital would not be liable. Neither can I subscribe to the statement in the opinion:

"The pads sometimes get out of repair through use, and, when this happens, they will overheat, or, in some instances, they will not heat."

When the expert witness, whose testimony is quoted, just prior to that statement, had recovered from his confusion, he said that, when he tested them on medium, they heated from 121° to 124° (at that heat, they were supposed to deliver 125°), and on low, 108° to 109°, whereas, with the switch so set, they were expected to deliver 110°. I have not been able to find any evidence in the record (Overacker's evidence relating to a different type of pad) which would even suggest that, when the type of pad involved gets out of order, it overheats. On the other hand, the same expert, to which the opinion refers, testified, later in his examination, as follows:

"Q. Have you had any brought to you, where you found from testing that they overheated, of this kind of pad? A. No. Q. Have you ever had any brought to you where they failed to heat? A. Lots of them."

And Sister Gonzaga, who had been supervisor of nurses at Providence hospital for three years, testified, concerning the type of pad involved in this case:

"Q. And what was the nature of the defects that you discovered in them? A. The only complaint was that the pad was slow heating. Q. Slow at heating? A. Yes, slow at heating."

Some argument is made to the effect that the rules of proof should be somewhat relaxed in this kind of a case on account of the fact that it is obviously difficult for the plaintiff to secure direct evidence that hospital equipment is defective. But if it be the law that a plaintiff in such a case can establish the defectiveness of a hospital appliance by merely calling the nurses who used it to testify that they were not negligent, the defendant hospital is somewhat handicapped also. I trust that it will not be offensive to suggest that it may well be doubted—human nature being what it is—whether the members of the nursing profession are any more prone to admit personal acts of negligence or

mistake than are the members of the other learned professions, including doctors, lawyers, and judges.

As Mr. Justice Brewer said, in pronouncing the opinion of the supreme court of the United States in *Patton v. Texas & Pac. R. Co.*, 179 U. S. 659, 45 L. Ed. 361, an opinion more fully quoted in the *Jankelson* case, this

" . . . is only one of the many cases in which the plaintiff fails in his testimony, and no mere sympathy for the unfortunate victim of an accident justifies any departure from settled rules of proof resting upon all plaintiffs."

For the foregoing reasons, I think the judgment should be reversed and the cause dismissed.

SIMPSON, C. J., STEINERT, and MALLERY, JJ., concur with ROBINSON, J.

---

June 15, 1943. Petition for rehearing denied.