[No. 28864.  *En Banc.*  April 30, 1943.]

MORRIS JANKELSON et al., *Respondents,* v. SISTERS OF CHARITY OF THE HOUSE OF PROVIDENCE, *Appellant.*[1]

*J. Speed Smith* and *Henry Elliott, Jr.,* for appellant.
*Kennett & Benton,* for respondents.

ROBINSON, J.—The Sisters of Charity of the House of Providence in the Territory of Washington, a cor-

[1]Reported in 136 P. (2d) 720.

poration, appeals from a judgment entered upon a jury verdict in favor of the respondents Jankelson and wife with respect to burns received by Mrs. Jankelson while she was a patient in its Seattle hospital.

The complaint in the action alleged that Mrs. Jankelson entered the hospital on September 27, 1941, for an operation on her right knee. A hot, moist pack was ordered as preoperative treatment. An electric pad was used by the nurses for the purpose of maintaining the temperature of the pack. In some way, the calf of Mrs. Jankelson's right leg was blistered and burned. The theory of the action is shown in paragraph III of the complaint, which reads as follows:

"That the foregoing injuries alleged to have been received by the plaintiff, Sophia Jankelson, were the sole, direct and proximate result of the administrative negligence of the defendants which consisted solely of the failure of defendants to furnish proper equipment for the purpose of warming plaintiff's leg under a regulated heat so that the said application of the electrical appliance would not result in injury such as alleged to have been sustained by the said plaintiff."

It will be noted that the complaint presented a very narrow issue. The issue was in no way enlarged during the trial. In giving instruction No. 4, to which no exception was taken by either party, after telling the jury that recovery could not be awarded on a mere finding that Mrs. Jankelson was burned while a patient, or even if such burns were received by reason of the negligence of its employees (the hospital being a charitable corporation), the trial judge further said:

" . . . but before the plaintiffs can recover they must prove by a fair preponderance of the evidence that Mrs. Jankelson received burns as the proximate result of being treated with a defective or unsafe electrical heating pad, . . ."

The single factual issue is further emphasized by the final sentence of that instruction:

"On the other hand, if you fail to find that the particular pad used upon the plaintiff was defective, or find that the burns were caused through the negligence of employees of the defendant in improperly applying the pad, then your verdict should be for the defendant."

The appellant's principal contention is that there was no evidence that the pad was in any way defective; hence, the case should not have gone to the jury, and that it should be entitled to judgment despite the jury's verdict.

The respondents' theory, in substance, is, as follows: It is admitted that the patient was burned as a result of heat generated by the pad. This could only have occurred in one of two ways, either through the negligence of the nurses employed by the hospital or because the pad itself was defective. We have shown that the hospital employees were not negligent; hence, the pad must have been defective. At all events, we made it more probable that defective thermostats were the real cause of the accident than any other; hence, we were entitled to go to the jury within the rule of the case of *St. Germain v. Potlatch Lbr. Co.*, 76 Wash. 102, 135 Pac. 804. The rule of law invoked by the respondents has been repeatedly approved in later cases and is as follows:

"It is sufficient if his evidence [the plaintiff's] affords room for men of reasonable minds to conclude that there is a greater probability that the accident causing the injury happened in such a way as to fix liability upon the person charged with such liability, than it is that it happened in a way for which the person so charged would not be liable."

More specifically, it was respondents' theory that the thermostats controlling the amount of heat had be-

come so ineffective through continued use that they failed to keep the pad at a safe temperature, and that the hospital was negligent in not periodically inspecting and testing its heating pads.

The appellant contends that there is no evidence whatever that the thermostats were defective, and that the evidence relied upon to so show does not even warrant a fair inference that they may have been; while, on the other hand, there is persuasive evidence that the pad was so applied that it slipped out of position, or was so displaced by the patient herself that, although it was applied on top of her knee, it got under and burned the calf of her leg. We are, therefore, required to make a complete analysis of the evidence.

The pad is a flat piece of rubber, about nine by thirteen inches in size, made by The Seamless Rubber Company of New Haven, Connecticut, and has been standard equipment in Providence, Swedish, Virginia Mason, St. Luke's, and Maynard hospitals in Seattle for eight or nine years. The trade name of the pad is "Electro-Sheet." Some forty wires are molded in the rubber sheet. The pad is activated by plugging into a light circuit and manipulating a three-way switch designed to deliver, at low, 110° Fahrenheit, at medium, 125°, and, at high, 135°. In each pad there are two built-in thermostats, one near each end of the pad and about eight inches apart. They are molded into the rubber and cannot be seen, inspected, or examined without cutting into and destroying the pad. When the pad is in operation, the hottest spot in the pad is midway between the two thermostats.

Mr. Overacker, an electrician called as an expert by the plaintiffs, testified that thermostats are bars of metal made up by welding together two metals, one having a higher expansion than the other. The bar will, therefore, bend when heat is applied. It is

adjusted so that it will bend far enough to break the circuit when the heat reaches a predetermined point. After a period of use, the expansion coefficient of one of the metals changes, the bar does not bend as readily, and the circuit is not broken at the predetermined temperature. Excess heat results.

We must give considerable attention to the testimony of this witness because the respondents place great reliance upon it, although, as we see it, it can, at the most, establish but one thing, that thermostats used in certain types of heating pads, as the witness said, frequently get out of order. That is no evidence that the thermostats in the pad involved in this case had done so. In fact, the testimony given by Mr. Overacker does not even relate to the type of thermostats used in the heating pad involved in this action. The witness testified, in part, as follows:

"*My experience with heating pad thermostats has been with the fabric-covered pads,* and I know that after they had apparently been in use for some time, they would be sent into the shop because they were too hot; and in many of the pads we were able to open them and unscrew a set screw, thereby moving the point further back and correcting the difficulty of having them overheat." (Italics ours.)

On cross-examination, he testified:

"Q. Now, on these pads that were brought in to you for repair, they were all the felt kind used in homes, weren't they? A. Yes, they were the *fabric-covered* pads. Q. *You never saw inside of one of these rubber ones? A. No, sir.* Q. That are used primarily by hospitals, have you? A. No, sir." (Italics ours.)

Respondents themselves introduced in evidence a statement of the manufacturer of the pad involved in this case, which reads, in part, as follows:

"THERMOSTATS. *There was no commercial thermostat available that answered the requirements of*

*Electro-Sheet, so a special one was developed and patented.* All thermostats are calibrated at 132° F. and triple-tested. *In several of the ordinary fabric pads the delicacy of the thermostats is a considerable source of trouble.* Electro-Sheet is moulded and vulcanized, under hydraulic pressure of ninety tons. *If the thermostats were not simple and rugged they could not possibly withstand this moulding pressure.* All thermostats are tested before and after moulding." (Italics ours.)

If the pad involved in this case had been a fabric pad (while Mr. Overacker's testimony would not have tended to prove that the pad was actually defective), it would have tended to prove that thermostats *in fabric pads* lose efficiency as "time passes" and are prone to get out of order. But, since the pad involved in the case at bar was expressly designed to avoid the troubles caused by the thermostats used in fabric pads by incorporating therein a new and different type of thermostat (necessarily new and different since it was patented) and which he had never seen and of the details or operating theory of which he knew nothing, it seems to us that his evidence had no probative value whatsoever with respect to any issue in the case.

The respondents, however, contend that, under the peculiar circumstances of the case, it has probative value. It is rightly said that there is no doubt but that Mrs. Jankelson was burned by heat generated in the pad. We submitted proof that the pad was properly applied; therefore, the jury was warranted in inferring that the pad must have overheated. In fact, it is the only theory upon which the result can be accounted for. The testimony of Overacker has probative value because it shows how the overheating could readily have taken place. This opinion has already dealt with the last contention. Is the theory that the pad overheated because of defective thermostats the only theory

upon which Mrs. Jankelson's burns can be accounted for? This question requires further detailed analysis of the evidence.

There is much evidence to the effect that the type of pad used is dangerous when not carefully applied and carefully watched. Sister Berchman, a supervisor who had held that position by day or night for more than four years, testified: "Q. They will burn people? A. If they are not applied properly, used properly."

Sister Eugenien, superintendent of the hospital, testified: "They are dangerous—they are always dangerous if they are not well applied and if they are not watched carefully."

At another point in her testimony, Sister Eugenien said it was necessary that they be watched because, if they were displaced and came in immediate contact with the skin, burns would result. She also made the point that, due to various causes, the skin of some persons will stand less heat than that of others.

There is evidence also that it is dangerous to apply these pads to an under surface, since the weight of the body will compress the wrappings and increase the surface heat. Nurse Brotherton testified:

"Q. Now, will you tell us whether you are trained to put a pad under any part of the body, that that part of the body may be resting on? Do you put it under the patient? A. Under, never. .We use hot water bottles only under any surface. Electric pads are used on the top or on the side."

The plaintiffs introduced in evidence the instructions for the use of the pads sent by the manufacturer with each pad, and showed, by the superintendent of the hospital, that these were supplied to the nurses who used the pads. Under the caption "Instructions for Use with Moist Heat," there is but one. It is printed in large black letters:

"Important. Do not apply this pad to a helpless person (an infant, an invalid or a sleeping or unconscious person) unless carefully attended."

The evidence shows, partly by hospital chart and partly orally, that the pack was applied to Mrs. Jankelson's right knee about eight-thirty Saturday evening, September twenty-seventh. Miss Hanscom, the nurse who applied it, demonstrated the method of application in the court room. It appears that three Turkish towels were dipped in an Epsom salts solution, and wrapped around the patient's right knee. Then a sheet of rubberized material is wrapped around the towels. Then the pad itself is laid across the knee, care being taken that no part of it gets under the leg. After this, a thick sheeting of cotton material is wrapped around the pack. In making up the pack, the end of a rubber tube is ordinarily enclosed in the towels in order that the heated liquid can be poured in to compensate for evaporation without undoing the pack.

Mrs. Jankelson testified that, when she came to the hospital, the pain in her knee was "terrible," and the chart shows that, after the pack was put on, she was given one and a half grains of nembutal to make her oblivious of the pain and induce sleep. There was a shift of nurses at eleven, Nurse McLean succeeding Nurse Hanscom. The chart shows patient sleeping at eleven-thirty, and again at two a.m., but at four-thirty: "Pt. complains that pack is burning. Her skin does not appear burned. No reddened areas. No solution applied." Opposite that marginal entry are the words: "Pack removed," and further down the chart, but still opposite the marginal entry: "Pack reapplied." Opposite six forty-five there is an entry: "Patient removed hot pack. Complains that it hurt her. Skin looks O.K.," and opposite that marginal entry: "Pack reapplied."

At seven, Nurse McLean went off duty and was succeeded by Nurse Brotherton. Sometime between seven and eight, she found the pack again removed and completely disassembled, the pad itself lying upon the bed covers. Nurse Brotherton recorded on the chart at eight a.m.: "Pack removed. Opposite side of calf of leg was a reddened area about 3″x5″. Several small blisters. Unguentine applied to dressing and waterproof adhesive applied." There can be no doubt, therefore, that the patient was burned some time between eight-thirty p.m., Saturday night, and eight a.m., Sunday morning, probably some time before that, because it takes some time for blisters to arise. It may have been before four-thirty, since Nurse McLean's oral evidence was to the effect that, when she reapplied the pack at four-thirty, she did not turn on the heat. On the other hand, Mrs. Jankelson tore the pack off some time between six forty-five and eight, because it was burning her.

There is positive testimony that, after Mrs. Jankelson's burns were dressed, about eight on Sunday morning, the wet pack was reapplied, and that the same pad was used, and the low heat turned on. It was so operating when Nurse McLean returned to duty at eleven that night.

Mrs. Jankelson could throw but little light on the matter. She was under the influence of a sedative during the time and remembers but very little. Although the chart and the testimony of the nurses indicate that she twice during the night removed and disassembled the pack, yet she remembers of having done so only once. As to this matter, she testified:

"Q. (By Mr. Kennett) What did you do when you woke up and felt this burning? A. I called the nurse. Q. And what was done then? A. The nurse just looked under the covers and said, 'It is all right,' and I laid quite awhile and then I fell asleep. Then I woke

up later and felt the burns and called the nurse. Q. And what happened then, when you called the nurse the second time? A. The nurse came in and I think she said, 'It is all right,' and then I fell asleep and I woke up again and—no, I didn't fall asleep. I was laying down; it was just burning me, and then I decided, 'Well, I will tear it off—it burns—tear it off, the pack,' and I tore it off."

Respondents correctly contend that they were not required to prove their case by direct evidence, but could do so by proving a consistent chain of circumstances from which a legitimate inference can be drawn. The ultimate inference claimed, and it is asserted to be the only possible inference, is that the burns must have been caused by a defective pad. But this so-called inference is not based upon a fact supported by evidence, but is arrived at by a process of elimination. The inference is asserted to be legitimate because (1) the only other possible cause was negligence of the nurses, and (2) they were conclusively shown not to have been negligent. Term (1) of that proposition is manifestly untrue, and (2) is more than doubtful. We say more than doubtful because, if the hospital were accountable for the negligence of its servants, there would be sufficient evidence here to take such a case to the jury on an allegation that they were negligent. We will not discuss this matter at length, but suggest this question: In view of the fact that the pad would burn the patient if it came into direct contact with unprotected skin, and even if, when still protected by its wrappings, it got under some part of her body, and of the further fact that Mrs. Jankelson was asleep, under the influence of a sedative so powerful that she could remember little of what happened during that night, and of the further fact that she tore the pack off and for a considerable period its component parts lay strewn about her bed, was she as

"carefully attended" as the hospital rule, hereinabove quoted, required a sleeping patient to be attended when this type of pad was being used?

That the only possible cause of the burns, the negligence of the nurses being eliminated, was a defective pad, is demonstrably untrue. While we do not suggest that Mrs. Jankelson was contributorily negligent, there is testimony by one of the nurses that she twice took apart and completely disassembled the hot pack. She herself was under the influence of a sedative, but remembered and testified that she tore the pack off at least once, and the nurse who came on the Sunday morning shift at seven o'clock testified that, when, in making her rounds, she arrived at Mrs. Jankelson's room some time before eight, the rubber pad was lying out on the bed covers. In manipulating the pack, she may even have turned the switch on higher. There is no evidence of that, but, in working with the pack, she could easily have flicked the switch. That possibility alone destroys the proposition that, negligence of the nurses being eliminated, the only possible inference is that the burns were caused by a defective pad. The proposition entirely disregards and fails to eliminate the proved and admitted fact that Mrs. Jankelson was herself an actor in this matter.

To our minds, there is no consistent chain of circumstances shown by the evidence by which the cause of Mrs. Jankelson's burns can be determined. Every avenue of approach ends in mere speculation. If we accept Overacker's evidence, and further gratuitously assume, in aid of it, that it applies to the type of thermostats used in the pad involved in this case, we run into well-nigh insuperable difficulties; for, if the pad burned Mrs. Jankelson during Saturday night because one of the metals composing its thermostat or thermostats had, through long use, lost its expansion coeffi-

cient, how did it instantly recover its expansion coefficient on Sunday morning? For the same pad was used on her knee all day Sunday and until at least eleven o'clock that night, and caused no burns. In fact, her knee, that portion of her body to which the pack was applied, was not burned at any time.

The pad was but nine inches in width and thirteen in length. The testimony is that it was laid across the towels on Mrs. Jankelson's knee, care being taken that no part of it got under her leg. In that position, it would deliver the greatest heat over the kneecap; for, as we have seen, the center of the pad between the thermostats is, when operating, its hottest spot. It remained (supposedly) in that position on Saturday night until Mrs. Jankelson tore it off. Yet, on Sunday morning it was found that the under side of her leg had been burned. Her daughter testified that the cast applied to protect the burned area, as well as the bandage later substituted for the same purpose, extended clear down to her mother's ankle. If the pad, while lying across the knee, burned these remote under surfaces, the heat must have arisen to a terrific height at the kneecap. Yet, the knee was not burned at any time, neither on Saturday night, nor on Sunday when the same pad was again applied to the knee under low heat, just as on Saturday night. This, to our minds, raises an inference, and a very strong one, that, at some time during Saturday night, possibly because the sleeping patient was not carefully attended, or in some other unknown way, perhaps through slippage, the pad became displaced and got under Mrs. Jankelson's lower leg. It will be remembered that the testimony is that a burn would result under such circumstances. Surely, while functioning directly on the kneecap, it could not have burned those remote under surfaces without burning the knee itself. We do not find, as a fact, that

displacement of the pack was the cause of the accident —to do so would be a mere speculation—but we think that it is a more plausible speculation than that the burns were caused by a defective pad.

■ Paraphrasing the rule of law which respondents invoke, we do not think that the evidence affords room for men of reasonable minds to conclude that the accident causing the injury was caused by defective thermostats in the pad rather than by other causes for which the appellant cannot be held liable. Neither do we think that the members of the jury, or anyone else, could determine the cause of the accident from the evidence adduced. The cause is speculative.

"The cause of an accident may be said to be speculative when, from a consideration of all the facts, it is as likely that it happened from one cause as another." *Frescoln v. Puget Sound Traction L. & P. Co.*, 90 Wash. 59, 155 Pac. 395.

"It is an elementary proposition that a liability for injuries cannot be predicated upon conjecture or speculation. It must be based upon actual proof both of negligence and of a causal relation between that negligence and the injury sustained." *Read v. School Dist. No. 211 of Lewis Co.*, 7 Wn. (2d) 502, 507, 110 P. (2d) 179.

"And where the testimony leaves the matter uncertain and shows that any one of half a dozen things may have brought about the injury, for some of which the employer is responsible and for some of which he is not, it is not for the jury to guess between these half a dozen causes and find that the negligence of the employer was the real cause, when there is no satisfactory foundation in the testimony for that conclusion. If the employe is unable to adduce sufficient evidence to show negligence on the part of the employer, it is only one of the many cases in which the plaintiff fails in his testimony, and no mere sympathy for the unfortunate victim of an accident justifies any departure from settled rules of proof resting upon all plaintiffs." *Pat-*

*ton v. Texas & Pac. R. Co.*, 179 U. S. 659, 663, 45 L. Ed. 361, 215 S. Ct. 275.

The judgment is reversed and the cause remanded, with instructions to dismiss the action.

SIMPSON, C. J., BEALS, STEINERT, MALLERY, and JEFFERS, JJ., concur.

GRADY, J. (dissenting)—I am unable to concur in the majority opinion. The factual situation developed in this case is so much like that of the case of *Clampett v. Sisters of Charity, post* p. 652, 136 P. (2d) 729, I feel it should be governed thereby.

The point of difference between Judge Robinson and the other members of the court who share his views and myself seems to be whether the evidence in the two cases, and any inferences that may be drawn from the same, warrants the conclusion that the electric pads involved were defective, and, by reason thereof, caused the flesh burns of which complaints were made.

In this case, the complaint of respondent is based upon administrative negligence on the part of appellant in furnishing an electric pad which was applied by the nurses to the limb of respondent and, by reason of its alleged defective condition, she was burned. The answer of the appellant denied any negligence on its part and set up affirmatively that it is a charitable institution. There was no claim made in the answer that the respondent was guilty of negligence which contributed to her injuries. During the trial, agents and employees of the appellant testified as to the treatment given the respondent in connection with the use of the electric pad, but it is not claimed that the employees of the appellant were negligent and by reason thereof injuries were sustained by respondent.

The case was tried and submitted to the jury on the theory of administrative negligence, the court specially

instructing the jury that, if the injuries sustained by the respondent were caused by the negligence of the employees of appellant in applying the electric pad to her limb, she could not recover damages.

The electric pad of which the respondent complains was not produced by the appellant, and the respondent never did have access to it or any opportunity to have it examined and tested. The evidence is, to a great extent, circumstantial, supplemented by the acts and conduct of the parties involved, together with the literature issued by the manufacturer of the pad, inferences that may be drawn from the entire evidence, and a sample of the type of pad used.

The jury would have been justified in finding, and evidently from its verdict did find, the following facts:

On Saturday evening, September 27, 1941, Sophia Jankelson, who will be referred to as though she were the only respondent, entered appellant's hospital for the purpose of having an operation performed on her right knee. She was given a sedative. An electric rubber heating pad was applied to her knee in the following manner: Three turkish towels that had been dipped in a solution were put around the limb. Over these towels a rubber sheeting was wrapped, and the pad was placed on top of the sheeting, and a fold of cotton cloth was put over the pad. The electric current was turned on low to generate heat to 110° Farenheit. The respondent went to sleep. About 4:30 Sunday morning, she felt the underside of her limb burn and complained to a nurse that the pack was too hot. The nurse removed the wrapping, shut off the electric current, and examined the limb, but found no appearance of a burn.

The pack was put on again, but the electric current was not turned on. The respondent continued to feel a burning sensation, so she removed the pack and pad

from her limb. The nurse called at six o'clock and found them laid to one side. The electric current was off. She examined the limb. The skin did not appear to have been burned, but respondent complained of a burn. The nurse replaced the pack and pad, but she did not turn on the electric current.

The nurse who came on duty at seven o'clock Sunday morning observed from the hospital chart that the respondent had complained about the pack. It had again been entirely removed and was away from the limb, and the respondent told her the limb had bothered her during the night. The nurse examined it and found there was an area about three by five inches on the posterior of the calf of the limb that was red and there were several small blisters. Unguentine was applied and the pack replaced. The electric current was turned on to generate heat to 110°. The pack and pad were kept on the limb with the current on and were still on when this nurse left at 3:30 in the afternoon. It does not appear just how long the pad remained on the limb after that time.

The record shows that the type of electric pad used is made of rubber. It is about nine inches wide and thirteen inches long, and, at its end, there is a switch by which the current can be turned on at "low," and this will generate heat to approximately 110°, "medium" to approximately 120°, and "high" to approximately 135°. When the pad is in use, the switch is connected by a cord with an ordinary wall or light socket. Built into the pad are two automatic thermostats, one close to each end, and an electric heating unit. The thermostats are bimetal strips with contacts on them. These strips expand and contract and thus open and close the circuit. The average life of a pad is about a year. It may become defective through use. Defects may develop in the thermostats or in the

switch. When the defect is in the failure to heat, it is because the current does not get into the heating unit. If the defect is in the failure to break the contact in whole or in part, the pad will overheat.

There is no claim made, and it does not appear, that respondent or whoever else removed the pack from her limb observed that the rubber of the pad had at any time been in contact with respondent's flesh. At no time was the switch set to generate a temperature higher than 110°, and a part of the time, while the pack and pad were around and on the limb, the switch was turned off. One of the Sisters of appellant, the superintendent, who had had considerable experience with electric pads, testified that, if an electric pad was in good working order and was well protected and carefully applied, it would not burn a patient, particularly if the switch was set at "low" or "medium." Another Sister, a supervisor of appellant, testified that such a pad would not cause a burn if it was in good working order, and was properly applied and carefully watched.

In the majority opinion, the expert witness called by the respondent is criticised, and the weight to be given his testimony minimized, because he stated that his experience with heating pad thermostats had been with the fabric covered type. But it must be borne in mind that he qualified as an expert on switches and automatic thermostats used in electric pads, his qualifications were not questioned, and his credibility and the weight to be given his testimony was for the jury; and, while it is true the manufacturer of these thermostats claims they are better constructed than others, the principle of their operation is the same. Anyone having knowledge of thermostats generally is competent to express an opinion as to whether, if this type becomes defective and fails to function, it may overheat. The witness was also competent to give an

opinion as to what might happen in the way of overheating if the switch were defective. The testimony of this witness is plain and clear-cut, and no attempt was made by appellant to shake it on cross-examination or to contradict it.

As I view the record, the case resolves itself into two questions: Did the respondent receive the burn because the nurses were negligent in the application of the pad or in their supervision of her while the pad was on her limb? Or did the respondent receive the burn because of a defective pad? There is no evidence that the burn came from any source other than the pad. The nurses testified as to how they had applied the pad and as to their supervision of the respondent. If their testimony is to be believed, the pad was properly applied at all times, and the respondent carefully supervised and attended. Their credibility was for the jury to determine. By its verdict, the jury found that the burn was not the result of any negligent act or omission on the part of the nurses. There was no question of any contributing act on the part of respondent submitted to the jury, and no such contributing act is now before this court. It has been made clear, and the jury found by its verdict, that the pad was properly applied and the respondent carefully attended. We are not called upon to assume that the pad itself came in contact with the flesh of respondent. The question must, therefore, follow: How did the respondent get the burn unless the pad was defective? It is not within our province to weigh the evidence or to speculate as to how the respondent was burned so as to support a finding on our part that the evidence, or what might reasonably be inferred therefrom, does not prove the pad was defective.

We have a situation where it appears: (1) An electric pad was applied to the limb of respondent; (2)

it was properly applied, and the respondent was carefully supervised and attended while the pad was in operation; (3) no negligence on the part of the nurses who attended the respondent was shown; (4) there was no contributory negligence claimed or shown on the part of respondent; (5) the switch on the pad was either on low (maximum temperature 110°) or the current was turned off; (6) this type of pad, if in good working order and properly applied, and particularly when set on low, will not burn a patient; and (7) the pad, while insulated by turkish towels, did burn the respondent.

It seems to me that the only rational answer is that either the pad itself or the switch was defective and the pad became overheated while on "low," or while turned off, or both, and caused the burn, and that this situation furnished ample grounds for the jury to find that the pad used was defective. Circumstantial evidence is often more cogent than evidence depending upon the veracity of a witness and very often more accurate results are capable of being obtained by inferences that may be drawn from a set of circumstances than from direct testimony. Many facts can be more accurately established by a process of elimination than in any other way, and many times this is the only way a fact can be established. This case has all these factors to a marked degree.

I think it may safely be said that, when an electric pad is claimed to be defective, and it appears that it will not burn a patient if it is in good order and properly applied, and a jury finds from the evidence that the pad was properly applied and carefully supervised and attended, and the fact is established that the patient did get a burn from the pad, there is then ample basis upon which the jury can proceed to determine whether the pad was defective; and the court

cannot at this juncture intervene and say as a matter of law that there is neither evidence nor a reasonable inference that may be drawn therefrom that the pad was defective or that to so say would be purely speculative.

When one is using an instrumentality that is safe, unless it contains some latent defect that makes it dangerous, and the manner of its use is such that, in the ordinary course of events, no harm will result, and, in using it, harm does come and the nature of the harm is that which results from a certain kind of latent defect, are we not entitled to conclude that there was such a defect therein? In so doing, we are not guessing or indulging in speculation. This is only done when a conclusion is arrived at that has no basis for its support or where there may be more than one cause of a given effect and it is as likely that the particular occurrence happened from one cause as another. But, when we do have such a basis as I have just outlined or as is developed by this record, and, of the two causes possible, one is conclusively eliminated by the evidence (or, as in this case, by the verdict of the jury), do we not have the right legitimately to conclude and infer that the effect was due to a certain cause? Whether an instrumentality is defective is essentially a question of fact, and, if the defect is latent and the instrumentality itself is not available so that it can be dissected or otherwise tested (as was the case here), it does not bar the complaining party from proving the defective condition by circumstantial evidence and by a process of elimination. The weight and sufficiency of such evidence is for the trier of fact to determine.

From a reading and study of the majority opinion, I cannot help but feel that the court is viewing this case from a factual standpoint, especially in view of the argumentative discussion therein. Much that is

said is foreclosed by the verdict of the jury. I feel that the record does not warrant the assertion:

"That the only possible cause of the burns, the negligence of the nurses being eliminated, was a defective pad, is demonstrably untrue. . . . To our minds, there is no consistent chain of circumstances shown by the evidence by which the cause of Mrs. Jankelson's burns can be determined. Every avenue of approach ends in mere speculation."

It seems to me that, when the question of negligence on the part of the nurses is eliminated and the chain of circumstances leading up to the burn sustained by the respondent is considered, we have here a situation where a conclusion may be drawn by a trier of fact as to whether the pad was defective, and that this is not a question of law for the court.

The trial judge declined to grant a motion for a nonsuit, overruled a motion for a directed verdict, and denied the alternative motions for a new trial and judgment notwithstanding the verdict; and, in so doing, I think he was correct, and that the judgment should be affirmed.

MILLARD and BLAKE, JJ. (dissenting)—We concur with Grady, J., that the judgment should be affirmed.

June 15, 1943. Petition for rehearing denied.