[No. 32488. *En Banc.* September 1, 1953.]

MARTHA PIERCE, *Appellant,* v. YAKIMA VALLEY MEMORIAL HOSPITAL ASSOCIATION, *Respondent.*[1]

*Harry Hazel,* for appellant.

*Gavin, Robinson & Kendrick* and *George M. Martin,* for respondent.

*Tonkoff, Holst & Hopp, R. Max Etter, Lewis L. Stedman, Henry Elliott,* and *Jack R. Cluck, amici curiae.*

HAMLEY, J. — This appeal presents a single question, namely: Where a paying patient of a charitable, nonprofit hospital sustains injuries by reason of the negligence of a nurse, may such patient recover damages from the hospital?

[1]Reported in 260 P. (2d) 765.

The alleged negligence consisted of the act of a hospital nurse in injecting a foreign substance into plaintiff's left arm, causing pain and permanent injury. It was not alleged that defendant failed to exercise due care in the selection or retention of the nurse, or that it was guilty of what has been termed "administrative negligence," such as the failure to furnish proper equipment.

The trial court sustained a demurrer to the complaint. Plaintiff declined to plead further, and an order dismissing the action with prejudice was accordingly entered. Plaintiff appeals.

The trial court followed the only course available to it in view of the past decisions of this court. In a line of cases extending from *Richardson v. Carbon Hill Coal Co.*, 6 Wash. 52, 32 Pac. 1012, decided in 1893, to *Clampett v. Sisters of Charity*, 17 Wn. (2d) 652, 136 P. (2d) 729, decided in 1943, this court has uniformly held that a charitable hospital is not, in the absence of a showing of negligence in the selection or retention of its doctors or nurses, liable for the negligence of such employees in treating a patient.

Under this rule of immunity, it has been held to be immaterial that the patient paid for his hospital service. *Wharton v. Warner*, 75 Wash. 470, 135 Pac. 235; *Magnuson v. Swedish Hospital*, 99 Wash. 399, 169 Pac. 828; *Tribble v. Missionary Sisters of the Sacred Heart*, 137 Wash. 326, 242 Pac. 372; *Miller v. Mohr*, 198 Wash. 619, 89 P. (2d) 807; *Canney v. Sisters of Charity*, 15 Wn. (2d) 325, 130 P. (2d) 899; *Weiss v. Swedish Hospital*, 16 Wn. (2d) 446, 133 P. (2d) 978.

Appellant asks us to overrule these decisions and withdraw from charitable institutions the cloak of immunity which now protects them from such suits.

This is not the first time we have been asked to re-examine and discard this rule of immunity.

In *Simon v. Hamilton Logging Co.*, 76 Wash. 370, 136 Pac. 361, which was before us in 1913, we declined to do so.

In *Magnuson v. Swedish Hospital*, *supra*, decided in 1918, we entered into such an inquiry. Our decision in that case to adhere to the rule was predicated upon four factors: the

constraint which the rule of *stare decisis* placed upon us; the fact that the legislature had not seen fit to repudiate the court-made immunity rule; the fact that the "overwhelming" weight of authority elsewhere favored immunity; and the view that the rule of nonliability serves a sound public policy. This latter view was expressed in these words:

"While the application of the rule to individual cases may sometimes seem harsh and the result regrettable, there are very few doctrines of the law of which the same may not be said with equal truth. When viewed in the light of a broader vision, however, we are convinced that the individual hardships wrought are offset many times over by the encouragement and stimulation which the rule of nonliability gives to the establishment and maintenance by private charity of institutions devoted to the care of the halt, the lame and the blind, and to the relief of those suffering from physical or mental disease and affliction." (p. 408)

In 1939, this court was again asked to re-examine our earlier cases. We declined to do so on the ground that the immunity rule had been consistently followed for a long period, and was in accord with the "greater" weight of authority. *Miller v. Mohr,* 198 Wash. 619, 89 P. (2d) 807.

The cause of action involved in *Miller v. Mohr* was before us again in 1940. *Miller v. Sisters of St. Francis,* 5 Wn. (2d) 204, 105 P. (2d) 32. The majority declined to review any question which had been decided on the first appeal. This would include the question of whether the immunity rule should be adhered to. Judge Robinson, with whom Judge Simpson agreed, filed a concurring opinion. While agreeing with the majority that the former opinion became the law of the case, Judge Robinson expressed the view that, were the court at liberty to disregard the former opinion, he would still (but for a different reason) favor the result reached by the majority. His reason is worth quoting:

"I have come to believe that the rule of tort non-liability of so-called charitable institutions has become an anachronism and should be no longer enforced. The only consideration that would cause me to hesitate is that so important a change in our established law ought ordinarily be made by

the legislature rather than by the courts. I note, however, that, although this reason was strongly urged by a dissenting justice, it did not deter the supreme court of California from recently abandoning the rule in a case decided some months after our opinion on the first appeal was rendered. *Silva v. Providence Hospital of Oakland,* 14 Cal. (2d) 762, 97 P. (2d) 798. I further note that, in a discussion of a similar case in 38 Columbia Law Review, 1485, 1489, it is logically contended that, since the rule was created by the courts, it may properly be modified or abandoned by them. Courts, however, rightly hesitate to make major changes in the law without some sort of advance warning or notice.

"It would serve no useful purpose to here set out the reasons why the rule should be abandoned. I think it appropriate, however, to call the attention of the administrative officers of hospitals and other charitable institutions to the fact that the trend in that direction has become very strong, and that it is rapidly increasing in momentum. As indicative of this, I cite the following: *Sheehan v. North Country Community Hospital* (1937), 273 N. Y. 163, 7 N. E. (2d) 28, 109 A. L. R. 1197; 38 Columbia Law Review (1938), 1485; the *Silva* case, *supra,* decided in January, 1940, and comments on the non-liability rule appearing independently in the May 1940 issues of three of our law reviews, towit: 28 California Law Review, 530; 26 Virginia Law Review, 951; and 1 Washington and Lee Law Review, 257. The next generation of judges will surely abandon the rule if we do not." (pp. 213-4)

The last time we were asked to abandon the immunity rule was in 1943. In *Weiss v. Swedish Hospital,* 16 Wn. (2d) 446, 133 P. (2d) 978, decided that year, it was held that the immunity rule should be adhered to. Judge Robinson wrote the opinion, and Judges Millard and Blake dissented. The majority gave the following reasons for adhering to the rule:

"When we consider the great diversity of variant rules which might be adopted, and at the same time remember that the rule with which we are dealing does not apply to hospitals alone but to churches, educational institutions, Y. M. C. A.'s, social welfare organizations, and, in general, to the various organizations engaged in philanthropic, benevolent, and charitable work, it is at once manifest that a change in the rule, particularly its complete abandonment, would have far-reaching and, perhaps, unimagined and unintended consequences. Furthermore, the hospitals are almost our

only existing training schools for nurses. Of our desperate needs in this regard we have just been forcibly reminded by the recent arrival at Seattle of nearly five hundred wounded men from but one of our many far-flung battle fronts." (pp. 454-5)

The above review of our past decisions indicates, and appellant concedes, that the one substantive reason which our court had advanced and relied upon as justifying the immunity rule, is that which has been broadly labeled "public policy." Even this substantive reason finds expression in only one of our decisions—*Magnuson v. Swedish Hospital, supra,*—and without actually using the term "public policy." The public policy consideration there advanced was that nonliability is desirable because of the "encouragement and stimulation" such a rule gives to worthy charitable institutions.

The fact that the immunity rule in this state is based upon a declaration of public policy made by our court thirty-five years ago has significance in determining whether we should now re-examine the rule. The factors upon which any public policy is based—the relevant factual situation and the thinking of the times—are not static. They change as conditions change, and as ways of looking at things change. As Judge Hays said, for the supreme court of Iowa, in repudiating the immunity rule announced in two earlier Iowa cases:

" 'Public policy' simply means that policy recognized by the state in determining what acts are unlawful or undesirable, as being injurious to the public or contrary to the public good. It is not quiescent but active. A policy adopted today as being in the public good, unlike the Ten Commandments, is not necessarily an ever-enduring thing. As times and prospectives change, so changes the policy. . . ." *Haynes v. Presbyterian Hospital Ass'n,* 241 Iowa 1269, 1272, 45 N. W. (2d) 151.

We therefore believe it to be appropriate, after this lapse of time since *Magnuson* was decided, to re-examine the public policy there announced, in the light of present conditions and present-day thinking.

Before doing so, however, it will be profitable to review the historical background of the immunity rule and the reasons, other than public policy, which have been advanced in its support.

It should first be noted that we use the term "immunity rule" merely as a matter of convenience. The "rule" is that one is liable for his negligent or tortious conduct. *President and Directors of Georgetown College v. Hughes,* 130 F. (2d) 810, 812. The "rule" is that charity is no defense to tort. Harper, Torts, 200, § 81; Prosser, Torts, 194-7, § 32; 2 Restatement of Torts, 873-884, §§ 323-325. The immunity from suit granted charitable institutions, in actions involving tortious conduct, is an exception to these rules.

Ordinarily, when a court decides to modify or abandon a court-made rule of long standing, it starts out by saying that "the reason for the rule no longer exists." In this case, it is correct to say that the "reason" originally given for the rule of immunity never did exist.

The doctrine declaring charities to be immune from tort liability was first pronounced in this country in *McDonald v. Mass. General Hospital,* 120 Mass. 432, 21 Am. Rep. 529, decided in 1876. It was there held that the funds of a charity are held in trust, the diversion of which the courts will not permit.

As its sole authority for this rule, the Massachusetts court cited *Holliday v. St. Leonard's,* 142 Eng. Reprint 769, decided in England in 1861. The *Holliday* case had followed *dictum* by Lord Cottenham, in *Duncan v. Findlater,* 7 Eng. Reprint 934, handed down in 1839. In 1846, Chancellor Cottenham had uttered similar *dictum* in *The Feoffees of Heriot's Hospital v. Ross,* 8 Eng. Reprint 1508. But the *dictum* of the *Duncan* case was overruled in 1866 (*Mersey Docks Trustees v. Gibbs,* 11 Eng. Reprint 1500), and the *Holliday* case was reversed in 1871. *Foreman v. Mayor of Canterbury,* L. R. 6 Q. B. 214. Thus the Massachusetts court resurrected the rule of *Holliday v. St. Leonard's* five years after it was repudiated in England.

Even today, the ghost of Lord Cottenham's *dictum* and the trust fund theory which it espouses, stand behind many of the court decisions which announce the immunity rule. Other courts which adhere to the rule have bolstered their reasoning with other theories. Most of these other theories fall into four groups, as follows: theory holding the doctrine of *respondeat superior* inapplicable to charitable institutions; theory that such institutions are entitled to the protection of the rule of governmental immunity; theory of implied waiver or assumption of risk; and theory of public policy.

It is probably true, as some courts have said, that all of these theories, and not just the one last mentioned, rest upon what some have conceived to be a sound public policy. *Andrews v. Y.M.C.A.*, 226 Iowa 374, 284 N. W. 186; *Ray v. Tucson Medical Center,* 72 Ariz. 22, 230 P. (2d) 220; *Dille v. St. Luke's Hospital,* 355 Mo. 436, 196 S. W. (2d) 615; *President and Directors of Georgetown College v. Hughes, supra.* The formulation of these individual reasons for non-liability thus appears to be, in the main, a product of rationalization. Those who had concluded that the public interest demanded immunity thereby found a way, satisfying to themselves, for reaching this result. *Andrews v. Y.M.C.A., supra;* 34 Yale Law Journal 316, 321.

The reasoning behind each of these theories, the criticisms which have been leveled at them, and the extent to which they have been accepted or rejected by the courts of this country, have been exhaustively documented elsewhere. *President and Directors of Georgetown College v. Hughes, supra;* 25 A. L. R. (2d) 29, annotation.

Some of the supporting theories referred to above were mentioned in *Magnuson v. Swedish Hospital, supra,* but without any indication that they found favor with our court. As before indicated, the only substantive reason which has been relied upon by this court is the basic theory of public policy. It will therefore serve no useful purpose to here enter into a detailed discussion of these other theories. It will suffice to say that the leading decisional and text authorities dealing with them have been examined, and we are

convinced that none of such theories provides a sound or logical basis for the rule of immunity.

We turn, then, to a consideration of the asserted public policy which demands that charitable institutions be immune from liability in a case such as this. The reasoning behind this declaration of policy was briefly stated in *Magnuson* and is quoted above. A more comprehensive statement of this policy is to be found in *Foster v. Roman Catholic Diocese,* 116 Vt. 124, 70 A. (2d) 230, 25 A. L. R. (2d) 1, as follows:

"Its essence is that suits for injury would cause a depletion of the funds of the charity, thereby depriving the public of its benefit and that the rights of the individual who is injured to redress should be subservient to the interest of the general public in the preservation of the institution; that it is better that one rather than many suffer; that the advantages to the public outweigh the detriment to the individual who has been injured." (p. 133)

Are the factual conditions and circumstances upon which this declaration of policy was based—the supposed need of charitable institutions for the "encouragement and stimulation" which the rule of nonliability affords (as we said in *Magnuson*)—the same now as they were in 1918, when we announced (and last considered) that policy?

The almost unanimous view expressed in the recent decisions of our sister states is that, in so far as the rule of immunity was ever justified because of the need of financial encouragement and protection, changed conditions have rendered the rule no longer necessary. *Silva v. Providence Hospital,* 14 Cal. (2d) 762, 97 P. (2d) 798 (1939); *President and Directors of Georgetown College v. Hughes,* 130 F. (2d) 810 (1942); *Durney v. St. Francis Hospital* (Del. Sup. Ct.), 83 A. (2d) 753 (1951); *Wendt v. Servite Fathers,* 332 Ill. App. 618, 76 N. E. (2d) 342 (1947); *Haynes v. Presbyterian Hospital Ass'n,* 241 Iowa 1269, 45 N. W. (2d) 151; *Mississippi Baptist Hospital v. Holmes,* 214 Miss. 906, 55 So. (2d) 142, 56 So. (2d) 709, 25 A. L. R. (2d) 12; *Foster v. Roman Catholic Diocese,* 116 Vt. 124, 70 A. (2d) 230, 25 A. L. R. (2d) 1 (1950).

. In the *Haynes* case, this recognition of a fundamental change in the conditions which prompted formulation of the immunity rule is expressed in these words:

"No doubt at the outset of the theory the need for charity in the way of treatment of the suffering was urgent and the general good of society demanded encouragement thereof. At that time hospitals, being the particular so-called charity which we have before us, were relatively few in number and were created and conducted solely by funds donated by public spirited people. Their doors were open to all alike irrespective of race, color, creed or ability to pay. There was little, if any, paternal care granted by the state. The granting of immunity from liability for the negligence of their employees may have been proper as a basis for encouraging such charity.

"Today the situation is vastly different. The business of the hospitals of today has grown into an enormous one. They own and hold large assets, much of it tax free, by statute, and employ many persons. The state has become paternal to an astonishing degree, as evidenced by numerous statutes found in our Code, such as chapter 250, Relief for Soldiers, Sailors; and Marines; chapter 252, Support of the Poor; chapter 253, County Homes; chapter 254, Tuberculous Patients; chapter 255, Medical and Surgical Treatment of Indigent Persons. Also we take judicial notice of the extensive use of the many types of hospital insurance, as well as liability insurance by the institutions. Thus it is evident that times have changed and are now changing in the business, social, economic and legal worlds. The basis for and the need of such encouragement is no longer existent." (pp. 1273-4)

The same basic change in conditions which is referred to in *Haynes v. Presbyterian Hospital Ass'n, supra,* and the other cited cases, has unquestionably occurred in this state. The extent to which the people as a whole, acting through their agencies of government, have, in recent years, assumed responsibility for the health and hospital needs formerly borne by individual donors, is made clear by reference to the state statutes relating to the following subjects, all enacted since *Magnuson* was decided: county and state tuberculosis funds, RCW 70.32.010 *et seq.*; hospital survey and construction, RCW 70.40.010 *et seq.*; public hospital dis-

tricts, RCW 70.44.010; health districts, RCW 70.46.010 *et seq.*; state otologist, RCW 70.50.010 *et seq.*; cerebral palsy program, RCW 70.82.010 *et seq.*; medical services for indigent persons, Laws of 1953, Ex Ses., chapter 5, p. 10; health measures for school children, RCW 28.31.020 *et seq.*

No invidious implications are intended by this comparison of the role of present-day hospitals with those of thirty-five years or more ago. The hospitals of today, as in times past, serve a purpose and perform a function which is essential and indispensable. The change in financial backing to which attention has been called reflects discredit neither upon the institutions of the day nor upon their public-spirited backers. It is simply a product of changed economic conditions and new conceptions of public responsibility.

We recognize, of course, that not all present-day hospitals are large and well-financed, and that there are some hospitals today which render a great deal of gratuitous service. This is especially true of church-maintained institutions and those which render special service, such as Children's Orthopedic Hospital of Seattle. Nor do we overlook the fact that the principles with which we are dealing have application also to such organizations as Y.M.C.A.'s, Y.W.C.A.'s, and Red Cross. Such organizations have benefited much less than hospitals from changed economic conditions and social outlook.

The public policy with which we are here concerned, however, must be based upon general conditions and the average situation. It cannot be designed to meet exceptional cases or deal with particular instances of hardship.

Perhaps the best way of determining whether the charitable institutions of today need the "encouragement and stimulation" which immunity affords, is to examine what has happened to them in jurisdictions where the immunity rule does not prevail. We have found nothing in the decisional law of this country to indicate, by statistics or otherwise, that undue hardships or calamities have befallen them. This same observation has frequently been made by other courts and text writers. See *Cohen v. General Hospital*

*Soc.,* 113 Conn. 188, 154 Atl. 435; *President and Directors of Georgetown College v. Hughes, supra; Foster v. Roman Catholic Diocese, supra;* 34 Yale Law Journal 316, 322; 38 Columbia Law Review 1485, 1486; 25 A. L. R. (2d) 29, 63, annotation.

■ In the instant case, it was alleged in the complaint that respondent hospital is fully protected by liability insurance from which any judgment for appellant would be paid. However, the fact that an individual defendant institution has, or does not have, such protection, is wholly immaterial in determining liability. The taking of liability insurance could create no liability where none before existed. *Susmann v. Young Men's Christian Ass'n,* 101 Wash. 487, 495, 172 Pac. 554. Our view in this regard accords with the great weight of authority. See 25 A. L. R. (2d) 29, 139.

The fact that the protection afforded by liability insurance is now available to charitable institutions generally is nevertheless appropriate for consideration, where the question is whether, as a matter of public policy, such institutions need immunity. *Mississippi Baptist Hospital v. Holmes, supra; President and Directors of Georgetown College v. Hughes, supra.* As Judge Rutledge pointed out in the latter case:

"What is at stake, so far as the charity is concerned, is the cost of reasonable protection, the amount of the insurance premium as an added burden on its finances, not the awarding over in damages of its entire assets." (p. 824)

■ There is one other circumstance worthy of note in appraising the factual justification for a public policy declaration that present-day charities need the immunity rule. Public policy, as the supreme court of New Hampshire has said, must be based upon a thoroughly developed, persistent, and united state of the public mind. *Welch v. Frisbie Memorial Hospital,* 90 N. H. 337, 9 A. (2d) 761, 764. If the facts tending to warrant a public policy declaration in favor of immunity were clearly established and well-recognized, we would expect to find general agreement among the courts in favor of such a policy.

But the reverse is true. There is perhaps as much diversity of judicial opinion on this question as on any question

with which the appellate courts of the country have been confronted. Ample documentation for this statement may be found in 25 A. L. R. (2d) 29, 70, where the annotator makes this comment:

"It is surprising to find that within the several states of the United States 'public policy' requires rules so inconsistent and conflicting as the rule denying any immunity, the rule granting complete immunity, the rule granting exemption of a charity's trust property from execution, and rules granting immunity under various kinds of limitations and qualifications."

If we were to judge the question before us solely upon a factual basis—whether there still prevail the conditions or circumstances which led our court, in 1918, to find that public policy required immunity—the considerations discussed above strongly indicate a negative answer. When we add to these considerations the searching criticisms which have been leveled at the justness and legal soundness of the rule, its repudiation seems almost compelled. In this connection, we cannot do better than quote the best summary of these criticisms which has come to our attention.

"In addition to the grounds relied upon in rejecting the specific theories in support of the immunity, the courts advocating abandonment of the immunity rule have pointed out that this rule found its way into the law through misconception or misapplication of previously established principles; that it is doubtful whether the administration of justice has ever been well served by the rule; that, in any event, the rule has become outmoded and is an anachronism; that it is a principle of law, as well as of morals, that men must be just before they are generous; that a charity should not be permitted to inflict injury upon some without the right of redress, in order to bestow charity upon others because the result would be to compel the victim to contribute to the charity against his will; that the law's emphasis generally is on liability, rather than immunity, for wrongdoing, and that, in particular, the modern tendency of the law is to shift the burden from the innocent victim to the community at large, and to distribute losses incurred by individuals through the operation of an enterprise among all who benefit by it rather than to leave them wholly to be borne by those who sustained them; that immunity tends

to foster neglect while liability tends to induce care and caution; that all persons, organizations, and corporations stand on an equality before the law, and all should be bound alike or excused alike; that the charitable nature of a tort-feasor cannot place it beyond the law applicable to all; and that protection of life and limb by organized society is of greater importance to mankind than any species of charity and is superior to property rights." 25 A. L. R. (2d) 29, 58, annotation.

The disparity among the decisions dealing with the immunity rule has been referred to above as an indication that there is no well-recognized factual basis for such a public policy. The fact that, among the twenty-seven states which grant immunity, sixteen do so only with regard to certain types of negligence or certain classes of plaintiffs, also seriously undermines the logic of the rule.

Among these jurisdictions which grant partial immunity, some grant immunity with respect to charity patients, but not paying patients; some grant immunity with respect to some or all patients, but not servants, invitees, or strangers; some grant immunity with regard to negligence of an employee, but not negligence in the selection of employees or the providing of equipment. There are numerous other modifications and refinements in the way the immunity rule has been applied. *President and Directors of Georgetown College v. Hughes, supra,* pages 817-818; 25 A. L. R. (2d) 29, 142.

In our own state, the rule of nonliability is available only with respect to suits brought by beneficiaries, *i. e.,* patients in the case of a hospital. *Heckman v. Sisters of Charity,* 5 Wn. (2d) 699, 106 P. (2d) 593. As to beneficiaries, there is no immunity where the negligence of the institution in selecting or retaining its employees is a proximate cause of the injuries. *Richardson v. Carbon Hill Coal Co.,* 10 Wash. 648, 39 Pac. 95; *Wells v. Ferry-Baker Lumber Co.,* 57 Wash. 658, 107 Pac. 869; *Wharton v. Warner,* 75 Wash. 470, 135 Pac. 235; *Simon v. Hamilton Logging Co.,* 76 Wash. 370, 136 Pac. 361; *Bise v. St. Luke's Hospital,* 181 Wash. 269, 43 P. (2d) 4.

Nor is there immunity in this state where the institution is guilty of some "administrative" negligence, as by the

failure to furnish proper equipment. *Miller v. Sisters of St. Francis*, 5 Wn. (2d) 204, 105 P. (2d) 32; *Clampett v. Sisters of Charity*, 17 Wn. (2d) 652, 136 P. (2d) 729. This latter exception to the immunity rule, however, does not apply where the defect is patent. In such case, the chargeable negligence is that of the employee who used an obviously defective appliance. *Canney v. Sisters of Charity*, 15 Wn. (2d) 325, 130 P. (2d) 899. In applying this particular exception to the immunity rule, some nice questions of fact have arisen as to whether the injury was caused by defective equipment or by the negligent use of proper equipment. See *Jankelson v. Sisters of Charity*, 17 Wn. (2d) 631, 136 P. (2d) 720; *Clampett v. Sisters of Charity, supra*.

Thus in this state, as elsewhere, the immunity rule has been "devoured" with exceptions. Moreover, the very fact that in Washington and fifteen other jurisdictions the immunity rule is applied only in certain classes of cases, argues strongly against its application in any case. If the financial security of charitable institutions—their "encouragement and stimulation"—does not require immunity in case of injuries to employees, invitees, and strangers, or injuries caused by negligence in selecting personnel and providing equipment, why does it require immunity where a patient is injured due to the negligence of a nurse?

The answer is so obvious that one would expect to find courts of last resort turning away from the immunity rule in their more recent decisions. This is exactly what has happened. It is interesting to note that in 1918, in the *Magnuson* opinion, we stated that nonliability was favored by the "overwhelming" weight of authority. Twenty-one years later, in *Miller v. Mohr*, 198 Wash. 619, 89 P. (2d) 807, we modified this to the "greater" weight of authority. In *Weiss v. Swedish Hospital*, 16 Wn. (2d) 446, 133 P. (2d) 978, decided four years later (1943), we found the majority in favor of immunity still less impressive. In that opinion it was stated that, "broadly speaking, more of the states adhere to the rule we have followed than to any other."

If the roll of other American state and territorial courts

was called today on the question of whether a hospital would be immune from suit under the facts of the instant case, we believe that it would show the following: Twenty-six courts would grant immunity; twenty would deny immunity; the result in four states and one territory would be doubtful.

The courts which would grant immunity are: *Arkansas*, Connecticut, Idaho, Indiana, *Kansas, Kentucky,* Lousiana, *Maine, Maryland,* Massachusetts, Michigan, *Missouri,* Nebraska, New Jersey, New York, North Carolina, Ohio, *Oregon,* Pennsylvania, Rhode Island, *South Carolina,* Texas, Virginia, West Virginia, Wisconsin, and Wyoming. Only the eight states shown in italics have complete immunity. In New York, the courts do not apply the immunity rule, as such, but reach the same result in a case of this kind by holding, as a matter of law, that hospital nurses are the employees of the patient rather than the hospital. In Rhode Island, the immunity rule is established by statute. In Maryland, the court-made immunity rule is apparently overcome by statute in cases where the institution carries liability insurance. See *Thomas v. Board of County Commissioners,* 92 A. (2d) (Md.) 452.

The courts which would deny immunity are: Alabama, Alaska, Arizona, California, Colorado, Delaware, District of Columbia, Florida, Georgia, Illinois, Iowa, Minnesota, Mississippi, New Hampshire, North Dakota, Oklahoma, Puerto Rico, Tennessee, Utah, and Vermont. In four of these jurisdictions—Colorado, Georgia, Illinois, and Tennessee—execution on such a judgment can be had only against non-trust property, such as liability insurance.

The five jurisdictions which must be classified as doubtful on such a roll call are Hawaii, Montana, New Mexico, and South Dakota, where no reported cases are to be found, and Nevada, where the one reported decision provides no reliable indication of what that court would decide on this precise question. See *Bruce v. Y. M. C. A.,* 51 Nev. 372, 277 Pac. 798.

Most of the decisions on the basis of which the above

summary is based are collected in 25 A. L. R. (2d) 29, 143-200, § 39. But see, also, the following very recent cases: *Moats v. Sisters of Charity of Providence*, 13 Alaska 546; *Roman Catholic Church Diocese of Tucson v. Keenan*, 74 Ariz. 20, 243 P. (2d) 455; *Thomas v. Board of County Commissioners, supra*; *Moeller v. Hauser*, 54 N. W. (2d) (Minn.) 639; *Williams v. Randolph Hospital, Inc.*, 75 S. E. (2d) (N.C.) 303; *Fisher v. Ohio Valley Gen. Hospital Ass'n*, 73 S. E. (2d) (W. Va.) 667; *Meade v. St. Francis Hospital of Charleston*, 74 S. E. (2d) (W. Va.) 405.

Thus, American judicial thinking, which formerly gave "overwhelming" acceptance to the immunity rule, now gives that doctrine a very modest majority. This indicates, of course, that the trend of recent decisions has been away from nonliability. Since the *Weiss* case was decided in 1943, four jurisdictions have abandoned the immunity rule and, in the process, have overruled earlier decisions. See *Ray v. Tucson Medical Center*, 72 Ariz. 22, 230 P. (2d) 220; *Haynes v. Presbyterian Hospital Ass'n*, 241 Iowa 1269, 45 N. W. (2d) 151; *Mississippi Baptist Hospital v. Holmes*, 214 Miss. 906, 55 So. (2d) 142, 25 A. L. R. (2d) 12; *Taverez v. San Juan Lodge*, 68 Puerto Rico 681.

Four other jurisdictions have, during the same period, rejected the immunity rule as a matter of first impression. See *Moats v. Sisters of Charity of Providence, supra*; *Rickbeil v. Grafton Deaconess Hospital*, 74 N. D. 525, 23 N. W. (2d) 247, 166 A. L. R. 99; *Foster v. Roman Catholic Diocese of Vermont*, 116 Vt. 124, 70 A. (2d) 230, 25 A. L. R. (2d) 1; *Durney v. St. Francis Hospital* (Del. Sup. Ct.), 83 A. (2d) 753 (not a court of last resort). During this ten-year period, no appellate court has joined the group which favors immunity, either as a matter of first impression or by overruling earlier decisions which rejected that doctrine.

Opinion among scholars outside the courts almost uniformly supports the doctrine of liability as against that of immunity. See 2A Bogert, Trusts and Trustees, 241-254, § 401; Harper on Torts, 655-658, § 294; Prosser on Torts, 1079-1085, § 108; and numerous law review articles listed

in 25 A. L. R. (2d) 29, 42. Some support for a rule of partial immunity is to be found in Scott, Treatise on Trusts, § 402, and 13 Notre Dame Law Review 107.

It is our conclusion that there is today no factual justification for immunity in a case such as this, and that principles of law, logic, and intrinsic justice demand that the mantle of immunity be withdrawn.

But it is argued that, regardless of these reasons for denying immunity under the facts of the instant case, we should not do so because it would require us to overrule a long line of past decisions. It is also argued that if there is to be any partial or complete abandonment of that rule after all of these years, it should be accomplished by legislative action and not by court decision.

The public policy upon which our rule is based is legislative in character. It pertains not to the functioning of courts and the administration of justice, but to broad economic and social considerations. Courts are not equipped to conduct a general investigation and ascertain the facts necessary to a determination of general public policy in such areas of life and action. Nor does the adversary character of court litigation lend itself to such an undertaking. Many courts have expressed the view that it is for the legislature, and not for the courts, to establish a policy exempting charities from tort liability. See the authorities collected in 25 A. L. R. (2d) 29, 73.

However, having previously undertaken this function, and having now concluded that our court-declared policy is no longer valid, there seems to be no compelling reason why we must wait for legislative action. We closed our courtroom doors without legislative help, and we can likewise open them. It is not necessary that courts be slow to exercise a judicial function simply because they have been fast to exercise a legislative one. As one writer has said:

"The courts which have granted immunity to charitable organizations appear to have usurped the legislative function of declaring public policy and making changes in the law in accord therewith. It would be strange for these same courts to sit back and wait for the legislatures to reverse

the value judgments the courts have made." 38 Columbia Law Review, 1485, 1489.

Several courts, as previously noted, have not sat back, but have, without waiting for legislative action, repudiated immunity rules which they had formerly announced and applied.

This same contention, that the court should not depart from a rule of nonliability which it had invoked but should leave this to the legislature, was made and rejected in *Borst v. Borst,* 41 Wn. (2d) 642, 251 P. (2d) 149. What we there said, as quoted below, is equally applicable here:

"We have not lost sight of the suggestion that the courts should wait until there is legislative sanction for such an action. There is involved here no rule of property or contract, but only a rule of nonliability benefiting a particular class of persons in actions *ex delicto.* There is no statutory sanction for the absolute rule of immunity announced in *Roller v. Roller, supra* [37 Wash. 242, 79 Pac. 788]. The purported reasons for the absolute rule have been found, on analysis, to be without merit. The true role of the legislature, under the circumstances, is to restrict liability if it chooses to do so, as it did in the host-guest situation. Where the proposal is to open the doors of the court, rather than to close them, the courts are quite competent to act for themselves. As Judge Desmond said in the recent case of *Woods v. Lancet,* 303 N. Y. 349, 102 N. E. (2d) 691, 694, in dealing with a similar suggestion:

" 'Legislative action there could, of course, be, but we abdicate our own function, in a field peculiarly nonstatutory, when we refuse to reconsider an old and unsatisfactory court-made rule.' " (p. 657)

In *Borst,* we overturned a rule of immunity which had stood since 1905 and, in doing so, expressly disapproved the early decision of *Roller v. Roller,* 37 Wash. 242, 79 Pac. 788. The decision in the *Borst* case reached a result contrary to the rule followed by the great majority of decisions dealing with the subject there under review. It did so, as we do here, on the basis of an examination of the reasons behind the generally-accepted rule and the discovery that they are without merit. See, also, *State ex rel. Paschall v. Scott,* 41 Wn. (2d) 71, 247 P. (2d) 543.

 It is our opinion that a charitable, nonprofit hospital should no longer be held immune from liability for injuries to paying patients caused by the negligence of employees of the hospital. Our previous decisions holding to the contrary are hereby overruled.

The judgment is reversed and remanded, with directions to overrule the demurrer.

MALLERY, SCHWELLENBACH, FINLEY, WEAVER, and OLSON, JJ., concur.

GRADY, C. J. (concurring)—I concur in the result reached by the majority opinion and the reasoning upon which it is based. I have usually been opposed to overruling cases in which we have declared a rule of law and such rule has been relied and acted upon for a long period of time. I have believed that if, for any reason, the rule should be changed, such change should be made by the legislature, especially if the rule be one relating to public policy. I expressed this view in my dissent in the recent case of *Hutton v. Martin,* 41 Wn. (2d) 780, 252 P. (2d) 581. However, experience has demonstrated that, when immunity from liability is involved, legislatures are faced with strong opposition to change by those who are the beneficiaries of such rule, and proponents of a change find efforts to secure corrective legislation futile. When such a situation arises and the courts have become convinced that the rule should no longer exist, there is justification for action to be taken by them.

The phase of the immunity rule involved in this case has been in the situation I have referred to, and I am convinced it should be modified and this can be accomplished only by court action. My conclusion is based upon the view I have always entertained that, whenever a person undertakes the performance of some act or duty which if negligently done or performed might cause harm to another, there is imposed upon him the legal obligation to exercise reasonable care in the doing or performing such act or duty, rather than by accepting as a sole guide the fact that the

particular doctrine is meeting with criticism and some courts have accepted such trend of thought.

HILL, J. (dissenting)—I shall not take issue with the very thorough and able majority opinion as to the desirability of the result achieved. I do insist that a change in a doctrine which has become fixed as a matter of public policy should be sought from the legislature, regardless of the reason upon which the rule is made to rest. *Hagerman v. Seattle,* 189 Wash. 694, 66 P. (2d) 1152, 110 A. L. R. 1110 (1937).

Long adherence to the rule of immunity on the part of charitable institutions from liability for their negligence, and the refusal of the legislature to interfere with that rule, have resulted in its acceptance as a public policy. The majority frankly recognize it as such, but say it is bad public policy and that they intend to change it.

It is persuasively but, in my opinion, not soundly argued that, since the court established the public policy now deemed to be erroneous, it should not hesitate to change it. This court did not by its initial or subsequent decisions in this field consciously undertake to establish a public policy; it attempted to apply the principles of the common law as it understood them to be, to a situation not covered by existing legislation. The rule which it laid down is now a matter of public policy.

Actually, the legislature can determine matters of public policy either by positive action or by inaction (acquiescence in rules laid down by the courts). The courts were not intended as policy-making bodies, and their limitations for the exercise of such a function are readily apparent. They act retroactively and without notice to any but the litigants; the legislature acts only prospectively and after all interested parties have had an opportunity to be heard.

The instant case presents, it seems to me, an excellent example of why the courts should leave changes in public policy to the legislature. After hearing only the litigants on a matter which affects, directly or indirectly, hundreds of charitable organizations and of which they have had no notice, the majority does what the legislature would not be

permitted to do, *i.e.,* change the public policy of the state *ex post facto.*

The views expressed by the majority, if unanswerable upon the merits, should be presented to the legislature by the interested parties. There is, in my opinion, no justification for a change by the court in a doctrine which has become fixed as a matter of public policy.

DONWORTH, J. (dissenting)—For sixty years this court has consistently followed the policy of encouraging the operations of charitable, nonprofit corporations by limiting their liability for negligence to their patrons to situations where they had direct control over the instrumentality which caused the injury. In other words, they have been held liable only for administrative negligence and for negligence in the selection or retention of incompetent employees.

This court on five separate occasions during the past thirty years has consistently refused to change its policy of holding that such corporations are not liable to patrons for the negligence of those employees over whose conduct the management has only remote control.

It has been thought that this policy encouraged the organization and operation of charitable enterprises by limiting their liability for the negligence of their employees in this manner.

Casting aside the doctrine of *stare decisis,* the majority in the present case now inform us not only that there is no longer any reason for the policy declared in our decisions of the past sixty years, but that there never was any sound basis for the rule in the first place. We have, apparently, during all this time piled error upon error because we did not realize that Lord Cottenham's *dictum* in 1861 had been repudiated by later English decisions.

But regardless of the origin of the error, the majority opinion bases its present determination to abandon our long-established policy upon the proposition that private charity has been displaced by a paternalistic government which will furnish free charitable services (as long as the taxpayers are financially able), and that hospitals,

Y. M. C. A.'s, Boy Scouts, Red Cross chapters, and other similar organizations do not any longer need encouragement. In my opinion, this proposition is without any factual support in this state at the present time.

Parenthetically, the new rule adopted in the majority opinion applies only to a paying patient (a term which is not defined therein), and I assume that the original rule still will remain operative as to free patrons of charitable institutions and those who are financially able to pay only part of the prevailing rate for the service rendered.

With respect to paying patients, these institutions will have to recognize that, under the new declaration of policy adopted by this court, they will either have to increase their rates or solicit larger charitable subscriptions in order to provide funds with which to pay the heavy insurance premiums which will be made necessary thereby. The principal beneficiaries of this change of policy will be the insurers.

I cannot yield my assent to the theory that charity is a relic of the horse-and-buggy days, and that presently these charitable institutions are no longer in need of encouragement because they have been supplanted by various governmental agencies of the welfare state. While public hospitals render a valuable and necessary service, they cannot take care of even a small fraction of all persons who need physical or mental care in this state. They were not intended to take the place of charitable hospitals, whose continued operation has always been, and should continue to be, encouraged.

In my opinion, nothing has happened in the last ten years (since our decision in *Weiss v. Swedish Hospital*, 16 Wn. (2d) 446, 133 P. (2d) 978) which justifies our abandoning our consistent policy of the last sixty years. Charity is still a virtue and is entitled to the same encouragement that it has always received at the hands of this court.

If the people of this state desire any change in this policy, it can be and should be accomplished through the legislature as suggested in Judge Hill's dissenting opinion in this case. The majority opinion provides an excellent example of the

inability of any court to intelligently function on a matter of public policy in a case of this kind because of its lack of facilities for ascertaining the necessary factual background. In this case, we have before us only the allegations of the complaint and matters of which we may take judicial notice. There is no allegation of fact nor matter within judicial notice that even remotely indicates that any factual change has taken place which would warrant the change of policy now approved in the majority opinion. On the contrary, I think that the major premise of the majority opinion is founded upon an erroneously assumed state of facts which is directly contrary to the actual situation presently existing in this state.

As for the decisions of other appellate courts upon this subject, which are thoroughly and ably reviewed in the majority opinion, it appears that in at least half of the states some form of immunity is still recognized in this type of litigation. While the recent trend has been toward denying immunity, I see no cogent reason for our following it.

In the absence of any factual basis for changing our long-established rule, it seems to me that the following statement from *Weiss v. Swedish Hospital, supra,* is still applicable and should be applied in this case:

"When we consider the great diversity of variant rules which might be adopted, and at the same time remember that the rule with which we are dealing does not apply to hospitals alone but to churches, educational institutions, Y. M. C. A.'s, social welfare organizations, and, in general, to the various organizations engaged in philanthropic, benevolent, and charitable work, it is at once manifest that a change in the rule, particularly its complete abandonment, would have far-reaching and, perhaps, unimagined and unintended consequences.

"The court has heard the instant case *En Banc,* and, after a careful consideration of the matter, it concludes that it should not abandon, or modify, the limited liability rule which it has so long held applicable in cases of this character."

Unless and until the legislature takes action in this matter (presumably after hearing all persons and institutions af-

fected by a proposed change), this court should continue to adhere to the policy which has been found to have been satisfactory for more than sixty years.

I would affirm the judgment.