20192

Adelaide T. BOYCE, Appellant, v. LANCASTER COUNTY NATURAL GAS AUTHORITY, Respondent.

(223 S. E. (2d) 769)

*Messrs. Bowers* and *Barnhill,* and *William H. Smith, Jr.,* of Columbia, *for Appellant,*

*Messrs. Fletcher C. Mann* and *Joseph E. Major,* of *Leatherwood, Walker, Todd & Mann,* Greenville, and *Charles Spencer,* of *Spencer & Spencer,* Rock Hill, *for Respondent,*

March 16, 1976.

*Per Curiam:*

This action for personal injury and property damage was commenced against Lancaster County Natural Gas Authority in January, 1975. The complaint alleges that an explosion occurred at plaintiff's home in Lancaster, S. C. on October 16, 1973 destroying the house and causing serious bodily injury to plaintiff. This explosion was allegedly caused by the negligence of the agents, servants and employees of the defendant.

The defendant demurred on the ground that it is an agency of the State of South Carolina and is thus immune to an action in tort because of the sovereign immunity of the State. The circuit court sustained the demurrer after finding. that the defendant is a public corporation and an

integral part of the State. Plaintiff has appealed from that decision.

The Lancaster County Natural Gas Authority (hereafter The Authority) was created by Act No. 879 of the 1954 Acts of the General Assembly as a "body corporate and politic of perpetual succession." The Authority was created for the purpose of securing a supply of natural gas for the benefit of the incorporated and unincorporated municipalities, and other populated areas within its service area, with authority to construct transmission lines and distribution systems in order to furnish natural gas service.

The manufacture and sale of power is a public and governmental function. *Welling v. Clinton Newberry Natural Gas Authority*, 221 S. C. 417, 71 S. E. (2d) 7. The South Carolina Public Service Authority was created by the General Assembly for the purpose, among others, of producing and selling electrical power. S. C. Code of Laws, § 59-1 *et seq*. This Court has held that the Public Service Authority is a quasi municipal corporation and is thus immune to an action *ex delicto* the same as the State itself. *Rice Hope Plantation v. South Carolina Public Service Authority*, 216 S. C. 500, 59 S. E. (2d) 132. There is no distinction between the power of a unit of government to manufacture and sell electricity and the power to buy and sell natural gas. *Welling, supra*. We see no substantial difference between the pertinent parts of Act No. 879 of 1954, creating the defendant, and Code Section 59-1 *et seq*. which established the Public Service Authority.

The defendant was created by the State, with its governing board appointed by State officials. It was created to perform a governmental function for the benefit of Lancaster County, a political subdivision of the State, and its net revenues are to be used by the municipalities which it serves. We agree that the defendant is a quasi municipal corporation and as such is immune to an action *ex delicto* because of the sovereign immunity of the State.

Section 4(a) of Act No. 879 of 1954 grants The Authority the power "to sue and be sued." Appellant contends that such power amounts to a waiver of the immunity to an action *ex delicto,* which The Authority would otherwise enjoy. This contention was rejected in *Rice Hope Plantation, supra.* We adhere to the reasoning advanced in that case.

Plaintiff urges us, as a matter of public policy, to hold The Authority subject to an action *ex delicto* for any torts committed by its agents or servants while engaged in a commercial or proprietary enterprise.

This Court has consistently refused to recognize a distinction between governmental and proprietary functions of a municipal corporation. *McKenzie v. City of Florence,* 234 S. C. 428, 108 S. E. (2d) 825. We refuse to draw the distinction here.

In the recent case of *Belton v. Richland Memorial Hospital,* 263 S. C. 446, 211 S. E. (2d) 241 the Court refused to overrule or modify the doctrine of sovereign immunity based on the following rationale, which we adopt:

We recognize that the doctrine of sovereign immunity has been assailed on many fronts and has been abolished or modified in more than one-half of the states either by judicial decision or by statute. While we have serious reservations about the soundness and fairness of the doctrine and do not question the authority of the courts to abolish it, we adhere to the view that reform in this field should be left to the legislature. That body has not been unmindful of the problem and over the years has enacted a number of statutes waiving immunity in specified cases on stated terms and conditions.

Plaintiff has suggested that even if the court should refuse to abolish the doctrine, she should be afforded relief by its modification in certain respects. We are convinced, however, that our only rational alternatives on this record

are to either abolish the doctrine or refuse to overturn our prior decisions. For the reasons already stated, we choose the latter course.

Affirmed.

LEWIS, C. J., LITTLEJOHN and RHODES, JJ., and Moss, Acting Associate Justice, concur.

NESS, J., dissents.

NESS, Justice (dissenting):

The appellant seeks relief from the unconscionable extension of governmental immunity to the respondent, a "quasi municipal" body. The respondent performs a purely proprietary function. It furnishes the same service as the South Carolina Electric and Gas Company and rural cooperatives —the sale of energy. The Act creating the Authority provides for distribution of profits to the municipalities within the service area, much like the payment of dividends to stockholders or replowing of surplus to members of a cooperative. The Authority operates on revenues generated through subscription charges; no taxes are levied against the public at large to support the Authority. Furthermore, the debt financing is by revenue bonds which *cannot* pledge the full faith and credit of the State. Had the appellant been injured by one of respondent's "private" counterparts, in like manner as is alleged in the complaint, she would have been able to prosecute her cause of action. Under these circumstances, I perceive of no reason why the respondent should be shielded with the impenetrable armor of governmental immunity.

While I entertain grave doubt about the continued vitality of the governmental immunity doctrine in general, the respondent has not assailed the doctrine in its entirety. My dissent rests upon the narrow issue before us: whether a "quasi municipal" body performing a proprietary function, financed solely by subscriber revenue or debt financing, not

pledging the full faith and credit of the state, should be required to respond in tort for its negligence.

Before examining the application of the doctrine to the case at bar, I would observe that the doctrine of governmental immunity has been riddled with exception after exception.

It is a far cry from the original common law principle which exempted the sovereign from liability in court on the basis that "the King could do no wrong."

Nationwide, it has been amended and eroded until the most that remains is an abstract and confusing principle which finds no continuity between jurisdictions. The application of the doctrine underlies a very broad field, the boundaries of which might be more rationally developed through a comprehensive legislative enactment. However, in the absence of any statutory directive, the time for judicial reexamination is long overdue.

The doctrine of governmental immunity is usually traced to the early English case of *Russell v. The Men of Devon*, 2 T. R. 667, 100 Eng. Rep. 359, decided in 1788, twelve years after the Declaration of Independence. There the court held that an individual could not maintain an action against the inhabitants of a county for injuries sustained because of the alleged negligence of the county. The court observed, "it is better that an individual should sustain an injury than that the public should suffer an inconvenience." 100 Eng. Rep. at 362. This 18th Century doctrine was subsequently repudiated by the English Courts which have held municipalities and school districts liable to suits for personal injury. See *Williams v. City of Detroit*, 364 Mich. 231, 111 N. W. (2d) 1, 24 (1961).

Nevertheless, as one court observed, the doctrine seems to have been "windblown across the Atlantic," first gaining acceptance in Massachusetts, *Mower v. Leicester*, 9 Mass. 247 (1812) later "set tumbleweed in motion" until

it became rooted in the jurisprudence in almost every state. *Stone v. Arizona Highway Commission,* 93 Ariz. 384, 381 P. (2d) 107 (1963).

The bedrock of the doctrine was the medieval notion that "the King can do no wrong." Professor Borchard has discredited this rationale:

"Nothing seems more clear than that this immunity of the King from the jurisdiction of the King's courts was purely personal. How it came to be applied in the United States of America, where the prerogative is unknown, is one of the mysteries of legal evolution." Borchard, Governmental Liability in Tort, 34 Yale L. J. 1, 4.

The practical adoption of the doctrine in this country seemingly was founded on the premise that the new government, following the Revolutionary War, was not financially sound enough to meet the claims of negligence in its governmental activities. Hence, the English Common Law was adopted and the same immunity which protected the King from liability was adopted to protect the states. This rule is court-made and therefore is subject to be unmade.

The basis for judicial acceptance of the doctrine was pragmatic. If the government had to defend suits and pay meritorious claims, under the theory of *respondeat superior,* essential governmental services may have been disrupted. Certainly, the relationship between the government and the people has changed dramatically since the birth of this country. The legislature may be confronted with a budgetary crisis, but the scope and breadth of services is vastly different from those offered even a decade ago. Hence, the purposes undergirding the broad and indiscriminate application of the doctrine have long since vanished.

Where the government has become so substantially involved in offering an increasing variety of services, the policy stated in *Men of Devon, supra,* that "it is better that an individual should sustain an injury than that the public

should suffer an inconvenience," 100 Eng. Rep. at 362, cannot be said to reflect sound philosophy today. As was so aptly stated in *Koontz v. City of Winston-Salem,* 280 N. C. 513, 186 S. E. (2d) 897, 908 (1972):

"We recognize merit in the modern tendency to restrict rather then to extend the application of governmental immunity. This trend is based, *inter alia,* on the large expansion of municipal activities, the availability of liability insurance, and the plain injustice of denying relief to an individual injured by the wrongdoing of a municipality."

The doctrine of governmental immunity has been almost unanimously berated.[1] In *Belton v. Richland Memorial Hospital,* 263 S. C. 446, 211 S. E. (2d) 241, 243 (1975), this Court expressed "serious reservations about the soundness and fairness of the doctrine." While *Belton* recognized that the Supreme Court possessed the authority to abolish the doctrine, we deferred to the General Assembly. Over a year has elapsed since *Belton* and no relief against the hardships resulting from immunity, or legislative adoption of the doctrine, has been forthcoming. The Maine Supreme Court in *Bartashevich v. City of Portland,* 308 A. (2d) 551 (1973) announced that continued legislative silence on the vitality of governmental immunity would invite judicial revocation of the doctrine. This Court's opinion in *Belton, supra,* can be construed as suggesting no less.

I do not share the belief that the court is muted by *stare decisis* and unalterably bound to follow precedence which is admittedly out of touch with the needs of the present day society. As one court observed, "we closed our courtroom doors without legislative help, we can likewise open them." *Pierce v. Yakima Valley Memorial Hospital Ass'n,* 43

---

[1] The Restatement (2d) Torts, Special Note Section 895B at 21 (Tent. Draft No. 19, March 30, 1973) lists some forty plus states which have totally or partially abolished governmental immunity or held that specific statutory authority to buy liability insurance constitutes a waiver of immunity to the extent that authorized insurance coverage is actually obtained.

Wash. (2d) 162, 260 P. (2d) 765, 774 (1953) (dealing with charitable immunity).

Justice Cardoza wrote in *The Nature Of the Judicial Process:* "If judges have woefully misinterpreted the mores of their day, or if the mores of their day are no longer those of ours, they ought not to tie, in helpless submission, the hands of their successors." page 152. Moreover, *Belton* recognized that *stare decisis* is a favored judicial policy in this State, but it is exactly that; a matter of judicial policy and not an immutable rule of law. That doctrine is nurtured by the compelling need for opinions of an appellate court to remain as constant as the proper administration of justice under an enlightened government will permit. *Dean v. Timmerman,* 234 S. C. 35, 42, 106 S. E. (2d) 665 (1959). It should not become the hallmark of judicial indifference to the perplexing problems of a changing world.

Public convenience can no longer outweigh individual compensation for injuries sustained through the negligence of its government. It is a sound principle of law that one who negligently causes injury must respond in damages. Moreover, courts should always be open to redress grievances. There are areas where immunity may be proper, even in the absence of legislation, however, in those instances the extension of immunity should be subjected to strict judicial scrutiny.

Exemption of the respondent from suit for the tortious activities of its employees is unconscionable. Reliance on the indiscriminate application of the ancient doctrine to thwart compensation for an injured party is not in keeping with public policy. It does little to enhance the betterment of society.

"The social climate which fostered the growth of absolutism and the divine right of kings in England has long since been tempered with the warm winds of humanitarianism and individual freedom. The changes which have oc-

curred in the last century with respect to the imposition of liability upon private corporate enterprises of any kind are well-known. Workmen's compensation laws have replaced the old theories which permitted the corporate organizations to escape liability under the fellow-servant rule or the doctrine of assumption of risk. Liability may now be predicated without fault merely on grounds that potential injuries to individuals must be calculated as a part of the cost of doing business, and must be paid for by the business enterprise. *There is widespread acceptance of a philosophy that those who enjoy the fruits of the enterprise must also accept its risks and attendant responsibilities."*

Smith, "Municipal Tort Liability." 48 Mich. L. Rev. 41, 48 (1949) cited with approval in *Ayala v. Phil. Bd. of Pub. Ed.,* 453 Pa. 584, 305 A. (2d) 877, 881.

The vitality of governmental immunity itself is not before us in the instant case; however, the respondent, by the sale of natural gas, engaged in a proprietary enterprise through which it sought revenues. Exactly what constitutes a proprietary function as opposed to a governmental function does not limit itself to precise definition. A governmental function is defined as that "which can be performed adequately only by the government." Prosser, Law of Torts, § 131, page 979 (4th Ed.). A proprietary function is one which the government unit performs but "which might as well be provided by a private corporation, and particularly when it collects revenue from it . . ." *Id.* at page 980.

While the governmental-proprietary distinction has been subjected to attacks by courts and commentators, such a distinction is preferable to total immunity. Furthermore, judicial retraction of an existing immunity should be considered in the context of adversary proceedings. Therefore, I would postpone consideration of total abolition or further erosion of the doctrine until the appropriate case is before the Court.

I would hold that the respondent must accept the risks and attendant responsibilities along with the fruits of its enterprise. I would abolish immunity for the negligent acts allegedly committed by it in the exercise of its proprietary function of selling natural gas.

I would Reverse and Remand.